MESCH CLARK ROTHSCHILD
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
       irothschild@mcrazlaw.com
       ecfbk@mcrazlaw.com
By:    Michael McGrath, # 6019
       Isaac D. Rothschild, # 25726
       85026/mbt

Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| SHURWEST, LLC, an Arizona limited liability corporation fka SHURWEST, INC., an Arizona corporation, | No. 2:21-bk-06723-DPC |
| Debtor. | |

# DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION (SUBCHAPTER V)
# DECEMBER 2022

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 2

II.   BACKGROUND ............................................................................................ 3

III.  PLAN OVERVIEW ...................................................................................... 8

IV.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............ 10

V.   IMPLEMENTATION OF PLAN .................................................................. 15

    A.   Funding the Plan.................................................................................. 15

    B.   Claims Allowance/Liquidation of Claims' Amounts.......................... 16

    C.   Payment/Distributions and Claims Reserve ...................................... 17

    D.   Delivery of Distributions.................................................................... 18

    E.   Management of the Debtor Post-Petition ........................................... 18

    F.   Conditions Precedent to Effective Date ............................................. 19

VI.  LIQUIDATION ANALYSIS ........................................................................ 19

VII.  RISK ANALYSIS ........................................................................................ 22

VIII. CONFIRMATION IN SPITE OF REJECTION OF PLAN..................................... 22

IX.  EFFECT OF CONFIRMATION .................................................................... 22

X.   RETENTION OF JURISDICTION............................................................... 23

XI.  TAX CONSEQUENCES ............................................................................... 24

XII.  MODIFICATION OF PLAN ......................................................................... 24

XIII. MISCELLANEOUS .................................................................................... 24

    A.   Definitions, Rules of Interpretation, Severability ............................. 24

    B.   Enforceability ..................................................................................... 25

    C.   Successors, Assigns and Applicable Law .......................................... 25

    D.   Exculpation and Limitation of Liability ............................................ 25

    E.   Notices ................................................................................................ 26

XIV. RECOMMENDATION OF THE DEBTOR ...................................................... 27

XV.  EXHIBITS .................................................................................................. 28

    A.   Definitions of Terms .......................................................................... 28

    B.   Declaration of Melanie Schulze-Miller................................................ 28

    C.   Income Projections ............................................................................. 28

    D.   Liquidation Analysis .......................................................................... 28

E.  Projected Distributions ................................................................................. 28

F.  List of Claims Against Third Parties .............................................................. 28

G.  Litigation Trust Agreement ............................................................................ 28

H.  List of Claims Against the Bankruptcy Estate ............................................... 28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

# I. INTRODUCTION

On August 31, 2021, Shurwest, LLC filed a Chapter 11 petition under Subchapter V. Shurwest proposes this Chapter 11 Plan, pursuant to section 1189 of the United States Bankruptcy Code, for the repayment of the allowed claims of its creditors.

The purpose of this case is to preserve Shurwest assets, rather than spending them in defense of 30+ litigation cases being brought against the Debtor in nine different states. The Debtor has resolved numerous claims during the pendency of the case. The Plan, once confirmed, will enable the Debtor to quickly resolve all remaining claims and to distribute Shurwest's assets to creditors as their claims are liquidated.

Additionally, the Plan will appoint the Sub V Trustee as the Litigation Trustee on or before the Effective Date to control and, if appropriate, pursue claims the Estate has identified against third parties for the benefit of the creditors instead of the Reorganized Debtor. The Litigation Trust Agreement is attached as **Exhibit G**. A list of potential claims is attached as **Exhibit F** hereto. This includes any action that is a general claim including the Uniform Fraudulent Transfer Action to which the Debtor is entitled, that could lead to alter-ego or successor liability.[1] It does not include any alter-ego claim that is personal in nature.[2] The Litigation Trust Agreement as attached shall be approved on an interim basis as of the order confirming this Plan. Any party may object to the form of the Litigation Trust Agreement for up to 30 days from the date of the Order confirming this Plan including potential beneficiaries and the Sub-V Trustee so that her counsel may have time to review

---

[1] "A general claim exists if the liability is to all creditors of the corporation without regard to personal dealings between such officers and such creditors. In other words, if the alter ego claim alleges acts that harmed the financial condition of the corporation as a whole and all creditors equally, such claims are general alter ego claims." *In re Capriati Constr. Corp.*, 2018 Bankr. LEXIS 818 (9th Cir. BAP 2018) quoting *In re Folks*, 211 B.R. 378 (9th Cir. BAP 1997), *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132-33 (2d Cir. 1993), and *In re Davey Roofing Inc.*, 167 B.R. 604 (Bankr. C.D. Cal. 1994).

[2] A cause of action is personal if the claimant himself is harmed and no other claimant or creditor has an interest in the cause of action." *In re Capriati Constr. Corp.*, 2018 Bankr. LEXIS 818 (9th Cir. BAP 2018) quoting *In re Folks*, 211 B.R. 378 (9th Cir. BAP 1997).

2

1  the Litigation Trust Agreement before it become final. Any objection must include a redline

2  of the Litigation Trust Agreement with the requested changes. This Court retains

3  jurisdiction to modify the Litigation Trust Agreement.

4          Unsecured creditors will receive a pro rata payment of the Debtor's projected net

5  operating income over three years after payment of the sole secured creditor and any priority

6  claims, as well as share pro rata in any potential recovery from the pursuit, if any, of third

7  party claims by the Litigation Trustee.

## II.     BACKGROUND

### *Nature of its Business*

Shurwest has been in the business of assisting those in the insurance business as an

independent marketing organization ("IMO") since 1992. As an industry-leading IMO,

Shurwest markets annuities and insurance products to registered investment advisors and

insurance agents on behalf of insurance carriers. Those advisors and agents, in turn, provide

financial planning advice and recommendations to their clients, generally retail consumers.

The gross revenue of Shurwest in 2020 was $3,048,762.00 with normal operating

expenses of $1,569,460.00. In the first two quarters of 2021, the gross revenue of Shurwest

was $1,452,150.00 with normal operating expenses of $678,442.00.

Since the Petition Date through June 30, 2022, the Debtor has had gross revenue of

approximately $1,538,429 and normal operating expenses of approximately $525,900.

At the time of filing this bankruptcy case, Shurwest leased approximately nine (9)

employees from a related employee-leasing company, Element Management Services, LLC

("Element").

### *Events Leading to the Filing for Bankruptcy*

Shurwest was a successful company, until it was irreparably harmed by the actions

taken by Melanie Schulze-Miller ("Schulze-Miller"). Schulze-Miller is the former National

3

1  Sales Director of Life Insurance for Shurwest. Ms. Miller and two other Shurwest

2  employees, Nick Johnson and Michael Seabolt, marketed and promoted certain structured

3  cash flow products of an unregistered and unlicensed company, Future Income Payments,

4  LLC's ("FIP"), <u>after</u> Shurwest rejected Schulze-Miller's proposal that Shurwest partner with

5  FIP. September 12, 2018, Schultze Miller declaration made under oath at Exhibit B. at 3-4.

6       On May 3, 2016, without Shurwest's knowledge, Schulze-Miller formed an Arizona

7  company, MJSM Financial LLC ("MJSM"), so that she could become a FIP referrer.

8  Schulze-Miller's intention in forming MJSM was to separate her Shurwest activities from

9  her FIP-related activities so she could be a FIP referrer without involving Shurwest. MJSM

10  referred advisors to FIP, and those advisors contracted directly with FIP. *Id.* at 4.

11       Schulze-Miller went out of her way to hide her FIP-related activities and disclaim a

12  relationship with FIP to Shurwest. **Shurwest did not have knowledge of MJSM's referral**

13  **practice and did not receive any part of Schulze-Miller's FIP referral fees or**

14  **commissions.** There is no Producer Marketing Agreement between Shurwest and FIP.

15  Shurwest never referred any business to FIP. Shurwest never contracted with FIP,

16  recommended FIP products, marketed FIP products or made any compensation off the sales

17  of FIP products. *Id.* at 4-5.

18       Schulze-Miller informed the advisors that she referred to FIP and others that her

19  work related to FIP was separate from Shurwest. To any extent Schulze-Miller used her

20  Shurwest email account to conduct the business of MJSM it was inadvertent. To any extent

21  Schulze-Miller directed Shurwest employees other than Seabolt and Johnson to perform

22  clerical tasks for MJSM, the employees did not know that the tasks were for the sole benefit

23  of MJSM. *Id.* at 5.

24       In April 2018, FIP shut down and ceased making payments to income investors. In

25  April 2018, Shurwest discovered that Schulze-Miller had been marketing, promoting, or

26  selling FIP products. In May 2018, Shurwest terminated Schulze-Miller's employment. *Id.*

at 6. Shurwest then sued Schulze-Miller for her unauthorized conduct. Schulze-Miller was represented by her own counsel and entered into a settlement of the lawsuit brought by Shurwest. In conjunction with the settlement of Shurwest suit, Schulze-Miller provided a Declaration which is attached as Exhibit B. Her sworn statements about the lack of Shurwest participation or knowledge of her relationship with FIP has since been recanted by Schulze-Miller. Shurwest believes the attached Declaration in which Schulze-Miller made statements under penalty of perjury, while represented by counsel of her own choosing, and receiving consideration of the dismissal of the Shurwest suit, is her true recitation of the facts. Numerous claimants, including Minnesota Life, dispute Shurwest's version of events recited above and asserted claims against Shurwest.

The FIP scheme of selling structured income products resulted in an investigation by criminal and regulatory authorities, including the Federal Bureau of Investigation. The investigation resulted in the indictment of principals of FIP and Schulze-Miller. Schulze-Miller has pled guilty to criminal charges and was awaiting sentencing as of this writing.

FIP's scheme was found to be an illegal and fraudulent Ponzi scheme by the United States District Court for the District of South Carolina. *In re Scott A. Kohn Future Income Payments, LLC,* District of South Carolina, Case No. 19-cv-01112-BHH.

The South Carolina District Court stayed any action involving FIP and other FIP entities. The U.S. District Court appointed a receiver over all entities with responsibility for investor losses resulting from the FIP scheme, including FIP, Schulze-Miller and MJSM. Shurwest is not a party to the FIP Receivership, and the District Court did not appoint a receiver as to Shurwest.

Despite never being implicated in the criminal and regulatory investigations or in the subsequent criminal cases, Shurwest and other non-debtor parties have been involved in extensive and costly litigation regarding FIP's structured cash flow products. The claims made against Shurwest include negligence, breach of fiduciary duty, aiding and abetting a

5

breach of fiduciary duty, negligent misrepresentation, negligent supervision, respondeat superior, unjust enrichment, California elder abuse, breach of contract, indemnification, violations of the Federal Securities Act of 1933 and Florida's Securities and Investor Protection Act. Due to lawsuits related to the events described, Shurwest's expense for professional fees alone in the first two quarters of 2021 was $1,756,791.00.

An Order was issued by U.S. District Court Judge Susan Bolton on Shurwest's Motion for Partial Summary Judgment in *Landmark American Insurance Company v. Shurwest, LLC, et al Arizona District Court Case No. 2:19-cv-04743-SRB at Docket No. 69.* The *Bolton Decision* discusses the facts underlying Schulze-Miller's acts and in relevant part concludes that Schulze-Miller acted without authorization from Shurwest in partnering with FIP: Shurwest did not have knowledge of MJSM's referral practice and did not receive any part of Schulze-Miller's FIP referral fees or commissions; and Schulze-Miller represented her work with FIP as separate from her work with Shurwest.

Numerous claimants, including Minnesota Life, dispute the Debtor's version of events described above and that the Bolton Decision has any relevance to their claims.

### *Generalized Alter-Ego and Successor Liability Claims Against Quantum*

In the various litigations pending throughout the country, some claimants have alleged alter-ego and successor liability claims against The Quantum Group, USA, LLC ("Quantum") or Element. At the same time, other similarly situated claimants have not brought alter-ego or successor liability claims against those parties.

The basis for the alleged alter ego and successor liability claims is laid out in the Ad Hoc Committee's Omnibus Statement of Facts (Docket No. 89). The summary of those allegations are:

- Shurwest and Quantum do a similar business;

- Shurwest and Quantum share the same address;

- Quantum and Shurwest share a phone number;

- Shurwest filed for the trademark "Quantum Group" and transferred it Quantum;

- Quantum and Shurwest are controlled by the same people or similar entities;

- Certain communications stated Shurwest is "rebranding";

- Some contractual rights or authority may have been transferred;

- Some agents that worked with Shurwest thought they were the same;

- Employees of Quantum or Element are similar to people who were employed by Shurwest; and

- Quantum offered website servicing that used to be offered by Shurwest to certain agents.

Shurwest's contractual relationships with Quantum and Element were arranged in good faith. The separate corporate existence of the two entities must be respected. The reasons for these agreements is laid out in greater detail in the Debtor's Responsive Statement of Facts at (Docket No. 120). The summary of those allegations are:

- Element was created as an employment services company;

- Certain lawsuits jeopardized the Shurwest business;

- Shurwest could no longer afford its full-time staff after certain lawsuits were filed;

- Shurwest could not work with certain life insurance or annuity companies due to the lawsuits;

- Shurwest could not raise capital;

- The creation of Element allowed employees to stay employed and not miss a paycheck;

- Quantum has a larger potential customer base than Shurwest ever did;

- The Services Agreement between Debtor and Quantum allowed the Debtor to make lease payments, recover for technology infrastructure and share other expenses that the Debtor would not otherwise be able to afford;

- Shurwest and Quantum maintain separate bank accounts;

- Quantum has not received any account receivables or payments owed to Shurwest; and

- Quantum and Shurwest maintain separate corporate records.

If the alter ego and successor liability claims against Quantum and Element are not resolved with the approval of the Court, either through an amendment to this Plan or a settlement pursuant to Bankruptcy Rule of Procedure 9019, they will belong to the Sub-V Trustee or other fiduciary exclusively to evaluate and, if viable pursue as generalized claims of transfers that create successor liability or alter-ego or other remedies as well as resolve any claims Quantum or Element have against the Estate.

The Debtor has worked to resolve procedural issues with over 100+ tort claimants. Additionally, the Debtor has also reached an agreement with its largest single claimant Minnesota Life. A Motion to Approve Settlement Pursuant to FRBP 9019 was filed with the Court on July 13, 2022 ("9019 Motion").  The Court approved the 9019 Motion on September 7, 2022 (DE 506), and the Court's order is final and non-appealable.

This Plan is designed to avoid the dissipation of Debtor's remaining and incoming assets on attorney's fees and costs of multistate litigation in dozens of lawsuits, and so as to guarantee a return on allowed claims against the Debtor's estate.

### III.    PLAN OVERVIEW

The costs of litigating disputed unliquidated tort claims in various venues throughout the country led to Shurwest's filing of a Chapter 11 bankruptcy petition. With the filing, the Bankruptcy Code automatically stayed the 30+ lawsuits in nine states against Shurwest arising from the FIP/Schultze-Miller fraud. On September 1, 2021, the Office of the United

States Trustee appointed Dawn Maguire, a Phoenix, Arizona attorney as the *Subchapter V Trustee*. She is charged with assisting in the negotiation of a Chapter 11 Plan, and other statutory responsibilities, and certain tasks post-confirmation under this Plan.

Through its Plan, the Debtor will pay its projected net operating income for a period of not less than three years to a reorganization fund (the "Reorganization Fund") for distribution to its creditors holding allowed claims. The Reorganized Debtor will pay any cash on hand after administrative creditors to the Reorganization Fund on the Effective Date, in not less than the following amounts:

- $719,200 to the Reorganization Fund on the first anniversary of the Effective Date,
- $885,200 to the Reorganization Fund on the second anniversary of the Effective Date and
- $1,071,000.00 on the third anniversary of the Effective Date. Shurwest will continue to operate its business for the duration of the Plan term.

Shurwest will retain all amounts of net operating income earned above these amounts.

The Debtor also proposes to assign claims against Quantum and Element (or any other related parties) held by the Estate to the Litigation Trustee for the benefit of the unsecured creditors. The claims to be assigned are either based on transfers allegedly made by Shurwest to Quantum and/or Element or conduct that may expose Quantum and/or Element to successor or alter-ego liability, which impacts all Shurwest creditors. The Litigation Trustee is Dawn Maguire and her employment as the Litigation Trustee will begin post-confirmation.

The Debtor will be responsible for resolving the claims of creditors through traditional claims allowance as permitted by the Bankruptcy Code and Bankruptcy Rules.

The Debtor's only secured creditor, RLS Capital Holdings, LLLP, will be paid in full with interest on the first anniversary of the Effective Date, by the Reorganization Fund.

9

Any priority creditors will be paid in full by the Reorganization Fund on the Effective Date or with statutory interest over three years (an initial distribution within 30 days of the Effective Date and an annual pro rata payment on succeeding anniversaries of the Effective Date for 3 total payments). Unsecured creditors will be paid a pro-rated portion of their allowed claim through the Reorganization Fund. A list of creditors is attached as **Exhibit H**. The Reorganization Fund will be the required minimum payments based upon estimated revenue from the Debtor's Net Operations post-petition, the Debtor will have the ability to finance the remaining projected net operating income prior to each anniversary of the Effective Date *plus* the recovery of any claims against third parties that belong to the Estate.

## IV. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The U.S. Bankruptcy Code provides that a reorganization plan shall divide interested parties into classes of similarly situated claimants. For purposes of voting and distribution, the Plan classifies creditors, equity security holders and interested parties as follows:

**Class 1 – Administrative Claims**

Administrative Claims are those that have been incurred since the initiation of these bankruptcy cases or expenses entitled to administrative priority pursuant to §§507(a)(2) or 503(b) of the Bankruptcy Code. Administrative Claims are funded through the assets of the Debtor. Class 1 Claims are estimated to include the following:

Estate Professionals.  Estate Professionals include all professionals whose employment was approved by the Bankruptcy Court, including but not limited to Mesch, Clark & Rothschild, P.C. (fees previously approved at DE 451 and 473), Wyche, PA (fees previously approved at DE 336), Dawn Maguire - the *Sub-V Trustee* (fees previously approved at DE282 and DE 461), King & Spalding (fees previously approved at DE 489), LLP, Law Offices of Michael W. Carmel, Ltd., Dentons Bingham Greenebaum, LLP and Miller, Pitt Feldman & McAnally, P.C (fees previously approved at DE 451).

As of November 10, 2022, Mesch Clark Rothschild is owed approximately $200,000, the Sub-V Trustee is owed approximately $30,000, King and Spalding is owed approximately $6,000 and Dentons is owed approximated $9,000.

Any Claims for fees, costs, and expenses incurred by any Chapter 11 Professionals after the Effective Date will be treated as part of the business operating fees and expenses of the Reorganized Debtor and need not be submitted to the Bankruptcy Court for approval, provided, however, that Dawn Maguire shall continue to submit fee applications for approval by the Court both for her role as Subchapter V Trustee and as Litigation Trustee, until such time as those roles are terminated pursuant to this Plan and the Bankruptcy Code.

All Estate Professionals shall file with the Bankruptcy Court and serve an application seeking approval and payment of any unpaid fees and costs incurred prior to the Effective Date pursuant to Bankruptcy Code §330 within 30 days after the Effective Date. Any such application that is not timely filed and served will be forever barred from distributions from the bankruptcy estate.

Post-Petition Expenses.  Post-Petition Expenses include the operating expenses of the Debtor incurred in the ordinary course of business after the Petition Date.

*These operating expenses have been paid in the ordinary course of the Debtor's business.  Any outstanding amounts will be paid in full on the later of the Effective Date, or in the ordinary course of the Debtor's business*.  Creditors that are current on their post-petition ordinary course payments do not need to file an Administrative Expense claim.  To the extent that any creditor believes it has an administrative expense claim that is not being paid in the ordinary course, that creditor must file with the Bankruptcy Court and serve its request for payment of administrative costs and expenses incurred after the Petition Date and prior to the Effective Date, pursuant to Bankruptcy Code §§ 507(a)(1) and 503(b), no later than thirty (30) days after the Effective Date.  Any such application that is not timely filed and served will be forever barred from distributions from the bankruptcy estate.

**Class 1 Administrative Expenses are not impaired and not entitled to vote.**

**Class 2 – Secured Claim of RLS Capital**

This class consists of the secured claim of RLS Capital. Prior to filing bankruptcy, RLS Capital loaned Shurwest the principal sum of $200,000.00 with interest accruing at $1,666.67 per month. This loan is secured by a first priority lien on all of the assets (tangible and intangible) owned by Shurwest. This claim is over-secured and will be entitled to payment of interest and costs, including reasonable attorney's fees incurred, if any, after the filing date pursuant to §506(b).

*The outstanding claim and any post-confirmation interest accruing at the WSJ prime rate, will be paid by the Reorganization Fund within twelve (12) months after Effective Date. RLS Capital will retain its prepetition lien, unless otherwise agreed by the parties.*

**Class 2 claim is impaired and entitled to vote.**

**Class 3 – Priority Tax Claims**

This class consists of any unsecured priority tax claims of the State of Arizona, the Internal Revenue Service, and any municipality authorized to assess and collect taxes. Shurwest is not aware of any priority tax creditors.

*The Class 3 Claims will be allowed in the principal amount of the tax due as of the Petition Date. On the Effective Date, the Debtor will pay these claims in full to the extent any such claims exist and have not already been paid. Any claims not paid in full on the Effective Date will accrue interest at the applicable statutory rate, and be paid in full with interest upon the availability of funds from Shurwest's business operations.* No such claims were scheduled by the Debtor or timely filed before the claims bar date in this case.

**Class 3 claims are unimpaired and not entitled to vote.**

1   **Class 4 – Priority Wage and Benefit Claims**

2       This class consists of the unsecured priority claims for wages, including back pay

3   earned within 180 days before the filing date, but only to the extent of $13,650 for each

4   individual, as provided by the Bankruptcy Code. This class also includes any unsecured

5   priority claims for paid time off earned by certain employees. The Debtor does not believe

6   that any such claims exist.

7       *Class 4 Creditors owed wages or benefits earned within 180 days before the filing to*

8   *the extent of $13,650 for each individual will be paid by the Reorganization Fund in full on*

9   *the latter of Effective Date, or allowance of the claim, to the extent any such claims exist.*

10  No such claims were scheduled by the Debtor or timely filed before the claims bar date in

11  this case.

12          **Class 4 claims are unimpaired and not entitled to vote.**

13

14      **Class 5—Unsecured Creditors with Rejection Damage Claims**

15      This class consists of any creditor holding an unsecured claim arising out of the

16  rejection by the Estate of an unexpired lease or an executory contract. The Debtor does not

17  believe that there will be any creditors in this class.  The Debtor has not rejected any

18  contracts during the pendency of this case, and does not intend to reject any contracts

19  through this Plan or otherwise.

20      *Allowed rejection claims holders will participate in the Reorganization Fund and*

21  *will receive a pro rata share in the amount that the allowed amount of its claim bears to the*

22  *size of the Reorganization Fund as of the Effective Date divided by the total of all Allowed*

23  *Class 5 and Class 6 claims. Allowed claims will receive an initial distribution within 30*

24  *days of the Effective Date from the Reorganization Fund and an annual pro rata payment*

25  *on succeeding anniversaries of the Effective Date for up to 4 total payments.*

26          **Class 5 creditors are impaired and entitled to vote.**

13

1

2    **Class 6 – Unsecured Claims**

3        This class consists of the allowed, outstanding unsecured claims as of the Effective

4    Date. The Bankruptcy Schedules reflect claims against Shurwest in this class of

5    $6,011,219.88. This class includes claims filed in the approximate amount of $160,000,000.

6        Creditors with Class 6 claims will be subject to the regular claims resolution process

7    as provided by the Bankruptcy Code and Bankruptcy Rules if a claim objection is filed.

8        *Allowed Class 6 claims holders will participate in the Reorganization Fund and will*

9    *receive a pro rata share in the amount that the allowed amount of its claim bears to the size*

10   *of the Reorganization Fund as of the Effective Date divided by the total of all Allowed*

11   *Class 5 and Class 6 claims. Shurwest listed several unsecured creditors in its schedules that*

12   *are not disputed. To the extent such creditors did not file claims, or filed claims in amounts*

13   *equal to or less than those scheduled by Shurwest, they will be deemed Allowed on the*

14   *Effective Date, in the lesser amount of the filed or scheduled claims, without the need for the*

15   *Debtor to file any claim objections or take any other action to reconcile those claims[3].*

16   *Allowed claims will receive an initial distribution from the Reorganization Fund within 30*

17   *days of the Effective Date and an annual pro rata payment on succeeding anniversaries of*

18   *the Effective Date for up to 4 total payments. Pro rata distributions will be calculated*

19   *reserving a proportionate amount for disputed claims as discussed below.*

20        **Class 6 claims are impaired and entitled to vote.**

21

22

23

24   [3] Notwithstanding this provision, because Quantum may be a target of an avoidance action, it
25   is not entitled to have its claims at #134 and #135 deemed allowed pursuant to 11 U.S.C. §
     502(d), even though no objection against Quantum's claims have been filed. To the extent
     any alleged transfers to Quantum are avoided or resolved prior to any given distribution,
26   Quantum may assert such avoided amount as an allowed claim pursuant to 11 U.S.C. § 502(h).

14

**Class 7 – Intentionally omitted.**

**Class 8 – Equity Interests**

This class consists of Shurwest's equity security holders. The equity holders of Shurwest are KT Equity Partners III, LLC, Shurwest Holding Company, Inc. and RLS Capital Holdings, LLLP.

*Current Equity will remain as Equity, they will not receive any distributions until after the Plan is fully consummated.*

**Class 8 interests are not impaired and not entitled to vote.**

**V.    IMPLEMENTATION OF PLAN**

**A.    Funding the Plan**

The Plan will be funded, in part, from Debtor's ongoing business operations. The post-petition gross income has been approximately $65,000 – 150,000 per month. The Debtor anticipates the post-confirmation operating expenses to be $35,000 – $40,000 per month. The net operating income will be contributed into a pool to be used for the repayment of allowed creditor claims, the "Reorganization Fund." For an understanding of the Debtor's Income Projections, please see **Exhibit C** attached, which provides projections for Shurwest net operating income to be funded into the Reorganization Fund over the next three years. For an understanding of the Debtor's projected distributions, please see **Exhibit E**.

The Estate will assign to the Litigation Trustee for the benefit of all creditors any of its claims, if any, against Quantum or Element derivative of Shurwest's alleged liability or any other claims the Litigation Trustee identifies prior to the Effective Date. This applies to any tort based claimants with generalized claims including those that arise from Uniform

Fraudulent Transfer Actions or other actions that may result in successor or alter-ego liability against Quantum or Element or their successors.

As discussed above, the Debtor will continue to operate the Shurwest business, under the review of the Sub V Trustee until substantial consummation. The Sub V Trustee will also be the fiduciary who makes distributions under the Plan if the Plan is not consensual. The Debtor's income derives from the sale of annuities and life insurance policies. The Debtor believes that the income is likely to continue as projected in **Exhibit C**, the Debtor's Income Projections.

**B.  Claims Allowance/Liquidation of Claims' Amounts**

i.    Claim Objections

The Debtor will be responsible for pursuing objections to claims asserted against the Estate. The Debtor will have authority to settle any claim disputes, and agree on the appropriate amounts of such claims. Court approval will be sought for resolution of claim disputes.

The Debtor is also authorized to file appropriate pleadings implementing this Plan in other jurisdictions as appropriate. The Sub V Trustee, and the Reorganized Debtor shall be paid from the Reorganization Fund after Fee Applications and subsequent order for any work related to pre-confirmation claims.

ii.    Alter Ego, Successor Liability and Fraudulent Conveyance Claims

If not resolved before the Effective Date, fraudulent conveyance claims and generalized alter-ego/successor liability against Quantum and Element (or related parties), and their successors, if any, liability shall be deemed transferred to the Litigation Trustee, in trust, by the order confirming the Plan to exclusively pursue and resolve for the benefit of the Estate and the Allowed Class 5 and Class 6 creditors. The Litigation Trustee and her professionals shall be paid from the Litigation Trust after Fee Applications and subsequent

order. Net recoveries after paying for any professional fees incurred through the litigation of these claims will be added to the Reorganization Fund for distribution in accordance with this Plan.

iii.     Deadlines

The Litigation Trustee shall initiate any avoidance actions or other lawsuits, and the Debtor shall file any claims objections on or before March 31, 2023. The Litigation Trustee shall be given a budget of $25,000.00 to investigate these claims that shall be reserved from any initial distribution from the Reorganization Fund. Any actions not timely filed by the Litigation Trustee shall be automatically deemed abandoned to the Debtor without further notice or motion, and the Debtor or other interested party shall have an additional 90 days to take appropriate action in the Bankruptcy Court until August 31, 2023. If no action is taken such claims shall be barred.

iv.     Claims Retained by the Debtor

The Debtor is retaining, and not transferring to the Litigation Trustee, its scheduled claims against Tami Hill and MJSM, LLC.  However, Debtor will not proceed with any additional actions to recover on these claims because the Debtor reasonably believes, in the exercise of its business judgment, that these claims are uncollectible.

**C.     Payment/Distributions and Claims Reserve**

Payments and distributions to each holder of a Disputed Claim that becomes an Allowed Claim will be made in accordance with the provisions of the class in this Plan to which such Allowed Claim belongs. The Sub-V Trustee will be the Disbursing Agent under the Plan. The first payment from the Reorganization Fund will happen within thirty days of the Effective Date. The Disbursing Agent shall withhold from the funds to be distributed under this Plan and reserve for the amount attributable to any Claim that is a Disputed Claim.  If a claim that is disputed is later allowed, on the next disbursement date under this

17

Plan, the Disbursing Agent shall disburse to that claimant its pro-rata distribution in the amount that is equal to (i) what the claimant would have received had a disbursement been made to that claimant on any prior distribution, plus (ii) the amount to which the claimant is entitled under the latest distribution.

### D.     Delivery of Distributions

Distributions will be made at the addresses set forth in the Proofs of Claim filed by holders of Claims, the addresses reflected on the Schedules or the addresses set forth in written notices of address change delivered to the Debtor, or to the Disbursing Agent after the Effective Date.

If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder will be made unless and until the Disbursing Agent is notified of such holder's then-current address, at which time all missed distributions will be made to the holder without interest. All claims for undeliverable or uncashed distributions must be made on or before the first (1st) anniversary of the date applicable to such distribution, or with respect to the final distribution to a creditor holding an Allowed Claim, within ninety (90) days thereof. After such date, all such unclaimed property will revert to the Disbursing Agent for further distribution in accordance with the Plan, and the Claim of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat law to the contrary.

### E.     Management of the Debtor Post-Petition

The Debtor will continue to be managed by the managers of Shurwest, LLC. The managers of Shurwest, LLC will not receive compensation for the management of the Debtor. Jim Maschek will continue as President of Shurwest, in effort to maximize net operating income he will not be paid by the Estate. Mr. Maschek is providing this service because he has an equity interest and is benefited by the completion of the Plan.

**F.** **Conditions Precedent to Effective Date**

The following are conditions to the Effective Date, which conditions must be satisfied or waived by the Debtor:

1) The Confirmation Order has been entered by the Bankruptcy Court.

2) The Confirmation Order is in form and substance satisfactory to the Debtor.

3) All the Debtor's cash on hand less a $50,000.00 operating reserve paid to the Reorganization Fund in an amount not less than $100,000.00 of which $25,000 shall be reserved for the Litigation Trustee's investigation as described in Section V.B.3 above.

## VI. LIQUIDATION ANALYSIS

Pursuant to 11 U.S.C. §1129(a)(7), the Plan must provide that creditors not accepting the Plan will receive at least as much as they would in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. Distributions to creditors under the Plan will exceed the recoveries they would receive in a Chapter 7 liquidation.

The Debtor's Liquidation Analysis does not include the value of claims the Estate may have against third parties, because those claims are preserved under this Plan for the benefit of creditors, and the recovery is presumed to be the same under either a Chapter 7 or this Plan. The Liquidation Analysis also does not include the Administrative Expenses that could be allowed the against the Estate, as the costs would be similar.

The following analysis summarizes the value of Shurwest's assets and the treatment of Shurwest's creditors in a Chapter 7 liquidation as compared to their treatment under the Plan:

| Assets | Creditor | Liquidation Value | Amount Available for Unsecured Creditors |
|---|---|---|---|
| Cash Collateral | RLS Capital | $506,778.39 | $306,778.39 |
| Cash that is not Collateral | N/A | $0.00 | $0.00 |
| Accounts Receivable | RLS Capital | $193,861.13 | $193,861.00 |
| Office Equipment Business Machinery, Equipment | RLS Capital | Estimated $10,000.00 liquidation value, not the book value listed on the schedules | $10,000.00 |
| Other Personal Property (intangibles, good will, security deposit) | RLS Capital | The intangibles listed on the schedules include goodwill; Debtor estimates that all intangibles have $0.00 as liquidation value. The Debtor has a security deposit of $45,000.00. | $45,000.00 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

| Claims | RLS Capital | The Debtor believes that any fraudulent transfer action or other claim against Quantum has no value, because no assets were transferred other than a trademark of no liquidation value, and the Debtor does not believe that any alter ego type claim would be successfully asserted. The Debtor believes that its claims against MJSM, LLC and Tami Hill also have no value because they are uncollectible. | $0.00 As a practical matter, Debtor believes that whatever value is ascribed to these claims, they have equal value under a liquidation or Plan scenario. |
|---|---|---|---|

The Debtor's Projections anticipate a return to unsecured creditors including administrative creditors of $2,676,200 through the confirmation of the Plan and including net operating income post-petition, but not including the liquidation of any claims against third parties for the benefit of the Estate. This is over $2,000,000 more than under the liquidation analysis, which would provide unsecured creditors including administrative creditors less than $200,000.00, not including the liquidation of any claims against third parties for the benefit of the Estate. Under a reorganization scenario, the Debtor will also retain the income from commission son renewals of previously sold policies that will be received and collected as insureds pay their premiums over the life of the Plan, but such commissions only become due to the Estate at the time such premiums are paid. The amount of the renewal revenue is unknown.

Based on the foregoing analysis, the Debtor believes that the Plan will provide a greater return to creditors than they would receive in a liquidation under Chapter 7. Accordingly, Shurwest satisfies the "best interests of creditors" test for confirmation of the Plan.

## VII.    RISK ANALYSIS

The projections are the Debtor's best and most realistic projections of future performance. Based upon these projections, the payments contemplated by the Plan will be made. Inherent in this Chapter 11 Plan are standard business risks. Despite these risks, Shurwest's Plan is workable and economically sound. The Plan will pay creditors more than they would receive if Shurwest's Plan were not confirmed, and this bankruptcy estate was liquidated instead.

## VIII.   CONFIRMATION IN SPITE OF REJECTION OF PLAN

The Court will be asked to confirm the Plan as to any class of claims or interest that does not accept the Plan. To do so, the Court must find that the Plan complies with standards established by the Bankruptcy Code, Section 1129(b).

## IX.     EFFECT OF CONFIRMATION

### *Discharge*

On the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in §1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in §1141(d)(6).

The Subchapter V Trustee shall act as Disbursing Agent and is entitled to compensation from the Debtor's projected disposable income. Any disputes regarding compensation of the Subchapter V Trustee will be subject to the Bankruptcy Court's

jurisdiction. Confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three years of this Plan, or as otherwise provided in §1192 of the Code. The Debtor will not be discharged from any debt: (i) on which the last payment is due after the first three years of the Plan, or as otherwise provided in §1192.

*Vesting*

Except as otherwise expressly provided in the Plan or in the Confirmation Order after funding the Reorganization Fund, and after the deemed transfers of claims and causes of action to the Liquidation Trust, any remaining estate assets will be vested with Shurwest as of the Effective Date, free and clear of all claims, liens, encumbrances, charges, and other interests of creditors, and Debtor will thereafter hold, use, dispose or otherwise deal with such property and operate its business free of any restrictions imposed by the Bankruptcy Code or by the Court. In the event of a post-confirmation conversion to Chapter 7, all assets will be vested in a Chapter 7 Trustee at the time of the conversion.

**X.    RETENTION OF JURISDICTION**

The Bankruptcy Court will retain jurisdiction of this case to:

A.    determine the allowance of claims or interests, costs, attorney's fees, and payment of post-petition interest, or objections thereto;

B.    adjudicate any pending or filed adversary suits, and for any other purpose regarding the Plan;

C.    determine the allowance and payment of any administrative expenses;

D.    determine any dispute arising from the interpretation, implementation, or consummation of the Plan;

E.    make any modification of the Plan in the best interest of the Estate;

F.    address the rejection or assumption of any executory contracts that are subsequently discovered;

G.      enter orders confirming this Plan and closing these cases; and

H.      remove the Claims Administrator or Sub-V Trustee or Disbursing Agent and determine the appointment of a replacement.

## XI.    TAX CONSEQUENCES

The Debtor has not obtained a tax opinion and does not express any opinion as to the tax consequences to the creditors or equity security holders. Interested parties are encouraged to obtain their own professional counsel to determine the tax consequences of the Plan. Because the Debtor expresses no tax advice, in no event will the Debtor or its professional advisors be liable for any tax consequences of the Plan. Creditors must look solely to and rely solely upon their own advisors as to the tax consequences of this Plan.

## XII.   MODIFICATION OF PLAN

The Plan may be corrected or modified, prior to or subsequent to confirmation, or prior to consummation, after notice to interested parties and by order of this Court as provided by law consistent with 11 U.S.C. §1193.

## XIII.  MISCELLANEOUS

### A.     Definitions, Rules of Interpretation, Severability

For the purposes of this Plan, terms (which appear herein as capitalized terms) shall have the meanings as defined herein or as set forth in the attached Exhibit A, "Definition of Terms." Such meanings are equally applicable to the singular and the plural forms of the defined terms unless the context otherwise requires. Unless otherwise provided in this Plan, all terms used herein have the meaning assigned to them under the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. The rules of construction applicable to the Bankruptcy Code and the Bankruptcy Rules are applicable to this Plan.

**B.     Enforceability**

Should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Plan.

**C.     Successors, Assigns and Applicable Law**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Arizona govern this Plan and any agreements, documents and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**D.     Exculpation and Limitation of Liability**

Pursuant to 11 U.S.C. §1107, the Debtor's fiduciaries are provided statutory qualified immunity for those instances they step into the shoes of a Chapter 11 trustee during the administration of this Case. This same qualified immunity is thereby imputed to the Debtor's bankruptcy Professionals authorized by the Bankruptcy Court to provide services on behalf of this Bankruptcy Estate. This qualified immunity is limited in nature. It only pertains to actions taken by the Debtor's fiduciaries and its authorized Professionals from the Petition Date, through the Confirmation Date, upon which date a Chapter 11 trustee's duties and responsibilities to the Bankruptcy Estate are terminated by statute. The qualified immunity is only applicable to those actions taken by the Debtor's fiduciaries and its authorized bankruptcy Professionals for actions that are necessary to the administration of the Bankruptcy Case. Qualified immunity shall not extend to ordinary business transactions of the Debtor. This qualified immunity is equal to the same protection afforded a bankruptcy trustee and such trustee's professionals. *In re Cochise College Park, Inc.*, 703 F.2d 1339,

Case 2:21-bk-06723-DPC    Doc 569    Filed 12/12/22    Entered 12/12/22 16:14:01    Desc
Main Document    Page 27 of 72

1359 (9th Cir. 1983); *In re Castillo*, 248 B.R. 153, 157 (9th Cir. BAP 2000); and *In re Kashani*, 190 B.R. 875, 883 (9th Cir. BAP 1995). Finally in recognition of the applicability of the Barton Doctrine, any party seeking to bring an action against a fiduciary of the Debtor, or its authorized professionals, for actions arising from or related to this bankruptcy proceeding, must seek permission of the bankruptcy court before commencing a lawsuit in another forum. *See In re Crown Vantage, Inc.,* 421 F.3d 963, 970 (9th Cir. 2005); see also *In re Kashani*, 190 B.R. at 885.

### E.    Notices

Except as otherwise set forth below, all notices, requests, elections or demands in connection with this Plan, including any change of address regarding any Claim, for the purposes of receiving any distributions under this Plan, shall be in writing and shall be delivered personally or mailed by stamped first class mail to the address below. Such notice shall be deemed to have been given the next business day after receipt or, if mailed by first class mail, seven (7) days after the date of mailing.

To: Shurwest, LLC
Attention James Maschek, President
17550 N. Perimeter Dr., Suite 300
Scottsdale, Arizona 85255

With copies to:
Mesch Clark Rothschild, PC
Attention Michael McGrath and Isaac Rothschild
259 N. Meyer Ave.
Tucson, Arizona 85701
mmcgrath@mcrazlaw.com
irothschild@mcrazlaw.com

Dawn M. Maguire
Trustee Maguire
5415 E. High Street, Suite 200
Phoenix, AZ 85054
TrusteeMaguire@gamlaw.com

## XIV.  RECOMMENDATION OF THE DEBTOR

The Debtor believes that the Plan represents the most practical and effective means for repaying the claims of creditors. The Debtor recommends that the Plan be approved as it is in the best interest of this Estate and its creditors.

1  **XV.  EXHIBITS**

2      **A.    Definitions of Terms**

3      **B.    Declaration of Melanie Schulze-Miller**

4      **C.    Income Projections**

5      **D.    Liquidation Analysis**

       **E.    Projected Distributions**

6      **F.    List of Claims Against Third Parties**

7      **G.    Litigation Trust Agreement**

8      **H.    List of Claims Against the Bankruptcy Estate**

9   DATED: December 12, 2022                  SHURWEST, LLC

10

11                                            By: ___/s/James Mascheck_____
                                                  James Maschek
12                                                Its President

13  MESCH CLARK ROTHSCHILD

14

15  By: ___/s/Isaac D. Rothschild, #25726_____
            Michael McGrath
16          Isaac D. Rothschild
            Attorneys for Debtor
17

18

19  Notice of Electronic Filing ("NEF")
    electronically served on the date of
20  filing upon the registered CM/ECF
    Users herein as evidenced by the NEF.
21

22  4886-4476-1663, v. 2

23

24

25

26

28

# Exhibit A

**"Definitions of Terms"**

# DEFINITIONS OF TERMS

A capitalized term used in the Plan defined in this section shall have the meaning specified below, unless the context clearly requires otherwise. A term used in the Plan that is not defined below and that is defined in the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure ("Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Rules. Terms used in the plural shall include the singular, and terms used in the singular shall include the plural. The terms "will" and "shall" are mandatory terms which may be used synonymously and interchangeably throughout the Plan without any distinction as to their meanings or mandatory nature.

1. **Administrative Claim:** Administrative Claim means any claim for any cost or expense of administration in connection with the Chapter 11 case, in accordance with § 503(b) of the Code, including, without limitation:

      a.    the actual, necessary costs and expenses of preserving the Debtor's estate (other than such claims or portions thereof which, by their express terms, are not due or payable before the Effective Date);

      b.    the full amount of all claims for allowance of compensation for legal or other professional services or reimbursement of costs and expenses under §§ 330 and 503(b) of the Code, including but not limited to legal fees and costs; and

      c.    all fees and charges assessed against the Debtor's estate under Chapter 123 of Title 28, United States Code.

2. **Allowed Claim:** Allowed Claim means a claim against the Debtor to the extent that:

      a.    a proof of such claim was timely filed or deemed filed pursuant to § 1111(a) of the Bankruptcy Code; and

      b.    which is not objected to, or which is allowed (and only to the extent allowed) by an order of the Bankruptcy Court that has become final and not subject to possible appeal, review, certiorari, or stay.

3. **Ballot**. Form for accepting or rejecting plan of reorganization (See, Bankruptcy Rule 3018.)

4. **Bankruptcy Case:** means the bankruptcy proceeding styled Shurwest, LLC, Case No. 2-21-bk-06753-DPC.

**5.** **Bankruptcy Code:** means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

**6.** **Bankruptcy Estate**: means the estate created under Bankruptcy Code §541 upon the Debtor's filing of the bankruptcy petition. On the Petition Date, all pre-petition assets of the Debtor were automatically transferred as a matter of law to the Bankruptcy Estate and remain property thereof.

**7.** **Bankruptcy Rules**: means the Federal Rules of Bankruptcy Procedure.

**8.** **Bolton Decision**: Order issued by U.S. District Court Judge Susan Bolton on Shurwest's Motion for Partial for Summary Judgment in Landmark American Insurance Company v. Shurwest, LLC, et al., Arizona District Court Case No. 2:19-cv-04743-SRB, which discusses the facts underlying Schulze-Miller's acts and in relevant part concludes that Schulze-Miller acted without authorization from Shurwest in partnering with FIP.

**9.** **Cash:** means legal tender of the United States of America.

**10.** **Claim:** means a "claim," as defined in section 101 of the Bankruptcy Code, against the Debtor's Bankruptcy Estate.

**11.** **Claims Category:** Categories as determined by Claims Arbitrator in Class 6.

**12.** **Claims Bar Orders:** The September 7, 2021 Notice of Chapter 11 Bankruptcy Case setting forth November 9, 2021, as the deadline for filing a proof of claim (except governmental units) and the June 1, 2022 Order Approving Application for Order Setting Limited Deadline for Filings Proofs of Claim (as to Cornine and Schulze-Miller Only).

**13.** **Class:** means a category of holders of Claims or Equity Interests as set forth in the Plan.

**14.** **Confirmation Date:** The date on which the Bankruptcy Court enters the Confirmation Order.

**15.** **Confirmation Hearing:** The hearing regarding confirmation of the Plan conducted pursuant to Bankruptcy Code § 1128, 11 U.S.C. § 1128, including any adjournment or continuation of that hearing from time to time.

**16.** **Confirmation Order:** The order confirming the Plan pursuant to Bankruptcy Code § 1129, 11U.S.C. § 1129.

**17.** **Court:** Court or Bankruptcy Court means the United States Bankruptcy Court for the District of Arizona and, with respect to the Bankruptcy Case, any other court which may have jurisdiction over such proceeding.

**18.** **Creditor:** means "creditor" as defined in Bankruptcy Code § 101(10), 11 U.S.C. § 101(10), and will include every holder of a Claim, whether or not such Claim is an Allowed Claim.

**19.** **Debtor:** means Shurwest, LLC, an Arizona limited liability company, fka Shurwest, Inc., an Arizona corporation.

**20.** **Debtor's Professionals:** Any and all professionals which the Debtor retains to assist in this bankruptcy matter or to provide professional services for a specified special purpose, all in accordance with Bankruptcy Code §§ 327(a) and 327(e), 11 U.S.C. § 327(a) and 327(e). (*See, also,* Estate Professionals.)

**21.** **Disputed Claim:** Every Claim which is not an Allowed Claim.

**22.** **Effective Date:** means thirty (30) days after the date of the Order entered by the Court confirming the Plan (the "Confirmation Date"), unless stayed by Court order.

**23.** **Equity Security Holders (or "Equity Holders" or "Members"):** means the equity holders of the Debtor, KTEP III, LLC (2500 units or approximately 25%), RLS Capital Holdings, LLLP (2600 units or approximately 26%), and Shurwest Holding Company Inc. (4850 units or approximately 48, as established according to applicable law, and based on the applicable operative documents for such entities.

**24.** **Estate Professionals:** All professionals whose employment was approved by the Bankruptcy Court, including but not limited to Mesch Clark Rothschild, attorneys for the Debtor, Wyche, P.A., and Dawn M. Maguire, the Sub-V Trustee. (*See, also,* Debtor's Professionals.)

**25.** **Final Order:** means an order of the court for which there is no stay on the Effective Date of the Plan.

**26.** **FIP or Future Income Payments, LLC:** Ms. Miller and two other Shurwest employees, Nick Johnson and Andy Seabolt, referred Advisors to certain structured cash flow products of an unregistered and unlicensed company, Future Income Payments, LLC's ("FIP").

4

**27.** **Insider:** Every individual and entity which is (or was at the time the claim arose) an "insider" as defined in Bankruptcy Code § 101(31), 11 U.S.C. § 101(31).

**28.** **Lien:** has the meaning set forth in section 101 of the Bankruptcy Code.

**29.** **Litigation Trustee:** Dawn M. Maguire

**30.** **MJSM:** An Arizona limited liability company formed by Melanie Schulze-Miller named MJSM Financial LLC, so that she could become a future income payment referrer.

**31.** **Petition Date:** means August 31, 2021, the date on which the Debtor filed its Chapter 11 Petition.

**32.** **Plan:** means the Chapter 11 Plan proposed by the Plan Proponent, including any amendment or modification made in accordance with the applicable provisions of the Code.

**33.** **Property**: means all real and personal property and contract rights in which the Bankruptcy Estate claims an interest, both legal and equitable.

**34.** **Reorganization Fund:** Through its Plan, the Debtor intends to pay its net operating income for a period of three years to a reorganization fund (the "Shurwest Fund") for distribution to its creditors holding allowed claims. Additionally, any claims that the Estate has against any third parties.

**35.** **Shurwest, LLC:** is the Debtor and the Plan Proponent. It is an Arizona limited liability company.

**36.** **Secured Claim:** Every Claim against the Debtor (including every secured portion of a Claim which is not fully secured) which is allowed in which the Creditor holding such Claim is secured by a lien, security interest, or assignment encumbering property in which the Debtor has an interest; provided, however, that such Claim will be a Secured Claim only to the extent of the validity, perfection, and enforceability of the claimed lien, security interest, or assignment and only to the extent of the value of the interest of the Creditor holding such claim against such property of the Debtor.

**37.** **Secured Creditor:** Every Creditor who holds a Secured Claim in this Case.

**38.** **State Court Litigation:** means all matters currently pending in any court.

5

**39.     Sub V Trustee:**  Dawn M. Maguire as appointed by the Office of the United States Trustee on September 1, 2021.

**40.     Unsecured Claim:** Every Unsecured Claim against the Debtor, which will be classified and paid under the Plan as provided therein, and which is not an Administrative Expense, a Priority Unsecured Claim, or a Secured Claim.

**41.     Unsecured Creditor:** Every Creditor allowed an Unsecured Claim in this Case.

4885-4984-0447, v. 1

6

# Exhibit B

## DECLARATION OF MELANIE SCHULZE-MILLER

I, Melanie Schulze-Miller, being duly sworn according to law, declare as follows:

1.     My name is Melanie Schulze-Miller.  I am an adult individual who resides in Arizona.

2.     I have personal knowledge of the information stated in this Declaration and make the statements herein after having consulted with my counsel.

3.     I was employed by Shurwest, L.L.C. ("Shurwest") from June 2012 until I was terminated by Shurwest in May 2018.  At the time of my termination, I was Shurwest's National Sales Director for Life Insurance.

4.     In early April or May 2016, I sought approval from Shurwest management to establish a relationship between Shurwest and Future Income Payments, LLC ("FIP") whereby Shurwest would refer financial and insurance advisors ("Advisors") to FIP and promote FIP's structured cash flow products to fund life insurance premiums for life insurance that the Advisors were offering to their clients.

5.     Shurwest management rejected my request to form a relationship between Shurwest and FIP and to refer, sell, or wholesale FIP products.  Shurwest management also never approved using FIP as a funding source for individuals to make life insurance premium payments.

6.     On May 3, 2016, without Shurwest's knowledge, I formed an Arizona limited liability company called MJSM Financial LLC ("MJSM").  I formed MJSM so that I could become a FIP referrer even though Shurwest never agreed to become a FIP referrer.  In other words, my intention in forming MJSM was to separate my Shurwest activities from my FIP-related activities so that I could be a FIP referrer without involving Shurwest.

7.   MJSM was wholly owned by me and I did not tell Shurwest management that I had formed MJSM. Shurwest had no relationship with MJSM and it was my intention to keep MJSM's activities separate from my duties for Shurwest.

8.   MJSM and FIP established a relationship whereby MJSM would introduce Advisors to FIP. Those Advisors contracted directly with FIP and had a duty to conduct their own due diligence before recommending any products to their clients.

9.   All commissions FIP paid pursuant to my relationship with FIP were made directly to MJSM. Shurwest received no referral fees from FIP or MJSM for my FIP related activities.

10.   Shurwest management did not know about MJSM, my referral fee relationship with FIP or any FIP-related commissions received by me or others. None of the commission payments flowed through Shurwest.

11.   The entirety of my relationship with FIP and all of the work that I did related to FIP was done for MJSM and not for Shurwest.

12.   I informed FIP, the Advisors that I referred to FIP and others that I dealt with regarding FIP, that my work related to FIP was separate from Shurwest. To this end, I eventually added the following disclaimer to all emails that I sent from MJSM regarding FIP:

> Please Note- I do not wholesale this structured cash flow product through Shurwest Financial Group, because it is not an insurance product, and they are an insurance marketing organization. Therefore, I wholesale it through MJSM Financial LLC as a separate entity. As a courtesy to Shurwest Financial Group, all communication regarding the structured cash flow business needs to run through mel@mjsmfinancial.com and the corresponding contact information below.

13.   Any use of my Shurwest email account for FIP-related issues was inadvertent. I meant to use my MJSM emails for all FIP-related business and instructed Advisors to use my MJSM email address for FIP-related business.

14. Unknown to Shurwest management, I on occasion directed Shurwest employees who worked under me to perform clerical tasks for the benefit of MJSM. I did not tell these employees that Shurwest management had not authorized MJSM doing business with FIP or that the tasks were being done for MJSM, an entity owned by me and unrelated to Shurwest.

15. I did not tell Minnesota Life Insurance about my separate business relationship with FIP until just prior to my termination from Shurwest.

I hereby certify under penalty of perjury that the foregoing statements made by me are true and correct.

Executed: 9/12/18

Melanie Schulze-Miller

# Exhibit C

**Shurwest, LLC**
**Income Projection**

| | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| | | | 2023 | | |
| **Cash Inflows** | | | | | |
| **Ordinary Income** | | | | | |
| **Income** | | | | | |
| Annuity Income | 242,000.00 | $ 255,000.00 | $ 265,000.00 | $ 278,000.00 | $ 1,040,000.00 |
| Life Income | 44,000.00 | $ 46,000.00 | $ 48,000.00 | $ 50,000.00 | $ 188,000.00 |
| Miscellaneous Income | 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 44,000.00 | $ 176,000.00 |
| **Total Income** | $ 330,000.00 | $ 345,000.00 | $ 357,000.00 | $ 372,000.00 | $ 1,404,000.00 |
| | | | | | |
| **Cash Outflows** | | | | | |
| Agent & Other Advertising Expense | $ 48,000.00 | $ 50,000.00 | $ 52,500.00 | $ 55,000.00 | $ 205,500.00 |
| Computer, CRM & Related Expense | $ 10,500.00 | $ 10,500.00 | $ 11,000.00 | $ 11,000.00 | $ 43,000.00 |
| Leased Employee/Payroll Expense | $ 85,000.00 | $ 69,000.00 | $ 72,500.00 | $ 75,000.00 | $ 301,500.00 |
| Office Expense | $ 3,200.00 | $ 3,200.00 | $ 3,200.00 | $ 3,200.00 | $ 12,800.00 |
| Consulting Expenses | $ 6,250.00 | $ 6,250.00 | $ 6,250.00 | $ 6,250.00 | $ 25,000.00 |
| Rent Expense | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 6,500.00 | $ 26,000.00 |
| Travel, Meals & Entertainment | $ 900.00 | $ 900.00 | $ 900.00 | $ 900.00 | $ 3,600.00 |
| Other Expenses | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 16,000.00 | $ 64,000.00 |
| **Total Expense** | $ 176,350.00 | $ 162,350.00 | $ 168,850.00 | $ 173,850.00 | $ 681,400.00 |
| **Net Cash Outflow** | $ 153,650.00 | $ 182,650.00 | $ 188,150.00 | $ 198,150.00 | $ 722,600.00 |
| | | | | | |
| **Net Ordinary Income** | | | | | |
| **Other Income/Expense** | | | | | |
| Other Income | $ - | $ - | $ - | $ - | $ - |
| Other Expense | $ (850.00) | $ (850.00) | $ (850.00) | $ (850.00) | $ (3,400.00) |
| **Net Other Income/Expense** | $ (850.00) | $ (850.00) | $ (850.00) | $ (850.00) | $ (3,400.00) |
| **Net Income** | $ 152,800.00 | $ 181,800.00 | $ 187,300.00 | $ 197,300.00 | $ 719,200.00 |

**Shurwest, LLC**
**Income Projection**

| | Q1 | Q2 | Q3 | Q4 | Total |
|---|---|---|---|---|---|
| | | | 2024 | | |
| **Cash Inflows** | | | | | |
| **Ordinary Income** | | | | | |
| **Income** | | | | | |
| Annuity Income | $ 290,000.00 | $ 305,000.00 | $ 320,000.00 | $ 336,000.00 | $ 1,251,000.00 |
| Life Income | $ 52,500.00 | $ 55,000.00 | $ 57,500.00 | $ 60,000.00 | $ 225,000.00 |
| Miscellaneous Income | $ 45,000.00 | $ 45,000.00 | $ 45,000.00 | $ 45,000.00 | $ 180,000.00 |
| **Total Income** | $ 387,500.00 | $ 405,000.00 | $ 422,500.00 | $ 441,000.00 | $ 1,656,000.00 |
| | | | | | |
| **Cash Outflows** | | | | | |
| Agent & Other Advertising Expense | $ 57,500.00 | $ 60,000.00 | $ 63,000.00 | $ 66,000.00 | $ 246,500.00 |
| Computer, CRM & Related Expense | $ 11,500.00 | $ 11,500.00 | $ 12,000.00 | $ 12,000.00 | $ 47,000.00 |
| Leased Employee/Payroll Expense | $ 87,500.00 | $ 78,000.00 | $ 81,000.00 | $ 85,000.00 | $ 331,500.00 |
| Office Expense | $ 3,500.00 | $ 3,500.00 | $ 3,500.00 | $ 3,500.00 | $ 14,000.00 |
| Consulting Expenses | $ 6,750.00 | $ 6,750.00 | $ 6,750.00 | $ 6,750.00 | $ 27,000.00 |
| Rent Expense | $ 6,700.00 | $ 6,700.00 | $ 6,700.00 | $ 6,700.00 | $ 26,800.00 |
| Travel, Meals & Entertainment | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 4,000.00 |
| Other Expenses | $ 17,500.00 | $ 17,500.00 | $ 17,500.00 | $ 17,500.00 | $ 70,000.00 |
| **Total Expense** | $ 191,950.00 | $ 184,950.00 | $ 191,450.00 | $ 198,450.00 | $ 766,800.00 |
| **Net Cash Outflow** | $ 195,550.00 | $ 220,050.00 | $ 231,050.00 | $ 242,550.00 | $ 889,200.00 |
| | | | | | |
| **Net Ordinary Income** | | | | | |
| **Other Income/Expense** | | | | | |
| Other Income | $          - | $          - | $          - | $          - | $          - |
| Other Expense | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (4,000.00) |
| **Net Other Income/Expense** | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (4,000.00) |
| **Net Income** | $ 194,550.00 | $ 219,050.00 | $ 230,050.00 | $ 241,550.00 | $ 885,200.00 |

**Shurwest, LLC**
**Income Projection**

| | 2025 | | | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Total |
| **Cash Inflows** | | | | | |
| **Ordinary Income** | | | | | |
| **Income** | | | | | |
| Annuity Income | $ 350,000.00 | $ 365,000.00 | $ 380,000.00 | $ 395,000.00 | $ 1,490,000.00 |
| Life Income | $ 62,500.00 | $ 65,000.00 | $ 67,500.00 | $ 70,000.00 | $ 265,000.00 |
| Miscellaneous Income | $ 46,000.00 | $ 46,000.00 | $ 46,000.00 | $ 46,000.00 | $ 184,000.00 |
| **Total Income** | $ 458,500.00 | $ 476,000.00 | $ 493,500.00 | $ 511,000.00 | $ 1,939,000.00 |
| | | | | | |
| **Cash Outflows** | | | | | |
| Agent & Other Advertising Expense | $ 70,000.00 | $ 73,000.00 | $ 76,000.00 | $ 79,000.00 | $ 298,000.00 |
| Computer, CRM & Related Expense | $ 12,500.00 | $ 12,500.00 | $ 13,000.00 | $ 13,000.00 | $ 51,000.00 |
| Leased Employee/Payroll Expense | $ 90,000.00 | $ 87,500.00 | $ 90,000.00 | $ 92,500.00 | $ 360,000.00 |
| Office Expense | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 16,000.00 |
| Consulting Expenses | $ 7,500.00 | $ 7,500.00 | $ 7,500.00 | $ 7,500.00 | $ 30,000.00 |
| Rent Expense | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 6,800.00 | $ 27,200.00 |
| Travel, Meals & Entertainment | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 5,000.00 |
| Other Expenses | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 19,000.00 | $ 76,000.00 |
| **Total Expense** | $ 211,050.00 | $ 211,550.00 | $ 217,550.00 | $ 223,050.00 | $ 863,200.00 |
| **Net Cash Outflow** | $ 247,450.00 | $ 264,450.00 | $ 275,950.00 | $ 287,950.00 | $ 1,075,800.00 |
| | | | | | |
| **Net Ordinary Income** | | | | | |
| **Other Income/Expense** | | | | | |
| Other Income | $ - | $ - | $ - | $ - | $ - |
| Other Expense | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (4,000.00) |
| **Net Other Income/Expense** | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (1,000.00) | $ (4,000.00) |
| **Net Income** | $ 246,450.00 | $ 263,450.00 | $ 274,950.00 | $ 286,950.00 | $ 1,071,800.00 |

# Exhibit D

**Shurwest, LLC**
**Liquidation Analysis**

| Assets | Creditor | Liquidation Value | Amount Available for Unsecured Creditors |
|---|---|---|---|
| Cash Collateral | RLS Capital | $ 506,778.39 | $ 306,778.39 |
| Cash that is not Collateral | N/A | $ - | $ - |
| Accounts Receivable | RLS Capital | $ 193,861.13 | $ 193,861.00 |
| Office Equipment Business Machinery, Equipment | RLS Capital | Estimated $10,000.00 liquidation liquidation value, not the book value listed on the schedules | $ 10,000.00 |
| Other Personal Property (intangibles, good will, security deposit) | RLS Capital | The intangibles listed on the schedules include goodwill; Debtor estimates that all intangibles have $0.00 as liquidation value. The Debtor has a security deposit of $45,000.00. | $ 45,000.00 |
| Claims | RLS Capital | The Debtor believes that any fraudulent transfer action or other claim against Quantum has no value, because no assets were transferred other than a trademark of no liquidation value, and the Debtor does not believe that any alter ego type claim would be successfully asserted. The Debtor believes that its claims against MJSM, LLC and Tami Hill also have no value because they are uncollectible. | $0.00 As a practical matter, Debtor believes that whatever value is ascribed to these claims, they have equal value under a liquidation or Plan scenario. |

# Exhibit E

**Payments to Reorganization Fund**

| | Effective Date | 1st Anniversary of Effective Date | 2nd Anniversary of Effective Date | 3rd Anniversary of Effective Date |
|---|---|---|---|---|
| Actual Cash on Hand - Administrative Claims | $251,000.00 * | | | |
| Commitment to Pay Projected Disposable Income | | $ 719,200.00 | | |
| Commitment to Pay Projected Disposable Income | | | $ 885,200.00 | |
| Commitment to Pay Projected Disposable Income | | | | $ 1,071,000.00 |

**Use of Funds**

| | Effective Date | 1st Anniversary of Effective Date | 2nd Anniversary of Effective Date | 3rd Anniversary of Effective Date |
|---|---|---|---|---|
| Class 2 RLS Capital | | $241,875.00 ** | | |
| Class 3 Priority Taxes | $ - | $ - | $ - | $ - |
| Class 4 Wage Claims | $ - | $ - | $ - | $ - |
| Class 5 Rejection Claims | $ - | $ - | $ - | $ - |
| Class 6 Unsecured Creditors | $ 251,000.00 * | $ 468,200.00 *** | $ 885,200.00 *** | $ 1,071,000.00 *** |

* Estimated
** Based on January 2, 2022 Effective Date
*** Subject to Reduction Based on Sub-V Trustee Claims Allowed Against the Estate / Subject to Increase Based on Time of Recovery for Any Claims Against Third Parties

## EXHIBIT F

## LIST OF CLAIMS AGAINST THIRD PARTIES PRESERVED

Any and all claims held by the bankruptcy estate under 11 U.S.C. sections 547, 548 (including state law Uniform Fraudulent Transfer Actions), and 549 with recovery rights under 11 U.S.C. sections 550 and 551, but not limited to only those sections in the event that avoidable transfers are discovered under 11 U.S.C. sections 544 and 545 against The Quantum Group USA, LLC ("Quantum") or Element Management Services, LLC ("Element") that may result in the remedy of a general claim of alter-ego or successor liability.

These claims stem from the allegations:

- Shurwest and Quantum do a similar business;

- Shurwest and Quantum share the same address;

- Quantum and Shurwest share a phone number;

- Shurwest filed for the trademark "Quantum Group" and transferred it Quantum;

- Quantum and Shurwest are controlled by the same people or similar entities;

- Certain communications stated Shurwest is "rebranding";

- Some contractual rights or authority may have been transferred;

- Some agents that worked with Shurwest thought they were the same;

- Employees of Quantum or Element are similar to people who were employed by Shurwest; and

- Quantum offered website servicing that used to be offered by Shurwest to certain agents

# Exhibit G

# CREDITOR TRUST AGREEMENT

This Creditor Trust Agreement (the "Trust Agreement") is effective as of _____, 2022, by and between Subchapter V Trustee Dawn Maguire (the "Litigation Trustee") as Litigation Trustee under this Trust Agreement, and Shurwest LLC, an Arizona Limited Liability Corporation, as debtor and debtor in possession ("Debtor"), in the Chapter 11 bankruptcy, Case No.: 2:21-bk-06723-DPC filed in the United States Bankruptcy Court for the District of Arizona (the "Court"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Plan (as defined below).

## RECITALS:

WHEREAS, pursuant to the "Order Confirming _____ Amended Plan of Reorganization (Subchapter V)", dated _____, 2022 (the "Confirmation Order"), the Court confirmed the "_____Amended Plan of Reorganization", dated December ___, 2022, as may be further amended (the "Plan").

WHEREAS, pursuant to the Plan, on the Effective Date, (a) the Reorganized Debtor will transfer certain assets to a post-confirmation estate to be known as the Creditor Trust created hereunder (the "Creditor Trust"), comprising of the Retained Causes of Action; and (b) the Creditor Trust will be entrusted to, among other things, liquidate, collect, and distribute: (i) Avoidance Actions; (ii) Causes of Action; (iii) the proceeds of Avoidance Actions and Causes of Action, if any; and (vi) such other claims or other assets of the Debtor that the Reorganized Debtor may, with the consent of the Litigation Trustee, designate from time to time (each such term as defined in the Plan).

WHEREAS, the Court shall have jurisdiction over the Creditor Trust and the Litigation Trustee, as provided herein and in the Plan.

## DECLARATION OF TRUST

NOW THEREFORE, in order to declare the terms and conditions hereof, and in consideration of the Recitals, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of the Plan and this Trust Agreement, the Reorganized Debtor absolutely and irrevocably grants, assigns, transfers, conveys, and delivers to the Creditor Trust, on behalf of and for the benefit of the Beneficiaries (as defined in Section 1.01 below), all right, title and interest of all of the Creditor Trust Assets;

TO HAVE AND TO HOLD unto the Litigation Trustee and its successors in trust; and

1

ON BEHALF OF THE CREDITOR TRUST THE LITIGATION TRUSTEE HEREBY ACCEPTS such rights and properties assigned and transferred to it and the trust imposed upon it, and agrees to make those payments and distributions required under the Plan and to all other duties set forth in the Plan and this Trust Agreement, and agrees to her appointment as trustee hereunder for such purpose under section 1123(b)(3)(B) of the Bankruptcy Code and to hold the Creditor Trust Assets in trust for the Beneficiaries;

PROVIDED, HOWEVER, that upon termination of this Creditor Trust in accordance with Section 4.01 hereof, this Trust Agreement shall cease, terminate and be of no further force and effect.

IT IS HEREBY FURTHER COVENANTED AND DECLARED, that the assets of the Creditor Trust are to be held and applied by the Litigation Trustee solely for the benefit of the Beneficiaries and for no other party, subject to the further covenants, conditions and terms hereinafter set forth.

## ARTICLE I
## DEFINITIONS

1.01   Certain Terms Defined. Terms defined in the Plan, and not otherwise defined herein, shall have the meanings ascribed to such terms in the Plan. For purposes of this Trust Agreement, the following capitalized terms shall have the following meanings:

"Administrative Costs and Expenses" means the administrative expenses of the Creditor Trust, including, without limitation, the Professional Fees, taxes, bank charges, filing and registration fees, postage, telephone, facsimile, copying and messenger costs, and secretarial and administrative costs attendant to the maintenance of the Creditor Trust and the responsibilities of the Litigation Trustee hereunder, the fees of the Litigation Trustee and any indemnification costs and expenses owing to any Indemnified Party under Section 8.05 hereof.

"Beneficial Interests" has the meaning set forth in Section 3.01 hereof.

"Beneficiaries" are (i)the holder of each Allowed Professional Fee Administrative Claims (subject to the limitations contained in the Plan) and (ii) each Allowed Classes 5 and 6 General Unsecured Claims in the Chapter 11 Case.

"Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) and with regard to Bankruptcy Rule 9006(c) in the State of Arizona.

Case 2:21-bk-06723-DPC   Doc 569   Filed 12/12/22   Entered 12/12/22 16:14:01   Desc
Main Document      Page 52 of 72

"Chapter 11 Case" means the case commenced by the Debtor before the Court, styled In re Shurwest, LLC, an Arizona Limited Liability Corporation, case no. 2:21-bk-06723-DPC.

"Court" has the meaning set forth in the Preamble of this Trust Agreement.

"Debtor" has the meaning set forth in the Preamble of this Trust Agreement.

"Creditor Trust" has the meaning set forth in the Recitals of this Trust Agreement.

"Creditor Trust Assets" means those assets of the Debtor transferred to the Creditor Trust and any earnings thereon.

"Creditor Trust Costs" has the meaning set forth in Section 5.01 hereof.

"Distribution" means any Interim Distributions and the Final Distribution.

"Distribution Date" means the date on which a Distribution is made.

"Final Decree" means the Final Order entered by the Court, which results in the closing of the Chapter 11 Case under Section 350(a) of the Bankruptcy Code.

"Final Distribution" means the last and final Distribution of Creditor Trust Assets or the proceeds of Creditor Trust Assets to the Beneficiaries, which occurs after the sale or other liquidation of all Creditor Trust Assets and upon full resolution of all Retained Causes of Actions and after which no Creditor Trust Assets remain, except as may be retained to fulfill duties or obligations under the Trust Agreement and to perform such other acts as may be required by law or as set forth in the Plan.

"Final Order" means an order, judgment or other decree of the Court which has been appealed but which has not been vacated, reversed, modified, amended or stayed, or for which the time to appeal such order, judgment or other decree has expired with no appeal having been filed.

"Interim Distribution" means any distribution of Creditor Trust Assets or the proceeds from the Creditor Trust Assets to the Beneficiaries, other than the Final Distribution.

"Litigation Trustee" has the meaning set forth in the Preamble of this Trust Agreement.

3

"Plan" has the meaning set forth in the Recitals of this Trust Agreement.

"Professional Fees" means the fees and expenses of professionals retained by the Litigation Trustee on behalf of the Creditor Trust (including, without limitation, attorneys, accountants, and experts).

"Proof of Claim" means a proof of claim, as defined in Rule 3001(a), Bankruptcy Rules.

"Trust Agreement" has the meaning set forth in the Preamble of this Trust Agreement.

1.02    Meanings of Other Terms. Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities. All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement, and the words "herein," "hereof" and "hereunder" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivisions of this Trust Agreement.

# ARTICLE II
# LITIGATION TRUSTEE'S ACCEPTANCE

2.01    Acceptance. The Litigation Trustee accepts the Creditor Trust created by this Trust Agreement and the transfer and assignment of the Creditor Trust Assets, on behalf of and for the benefit of the Beneficiaries, and agrees to observe and perform the trust, upon and subject to the terms and conditions set forth herein and in the Plan.

2.02    Purpose of Creditor Trust. The purpose of this Creditor Trust is to implement the Plan by providing for the vesting in the Litigation Trustee of the ownership of and the responsibility for the protection and conservation of the Creditor Trust Assets on behalf of and for the benefit of the Beneficiaries, the making of any other payments provided to be made from the Creditor Trust as set forth in the Plan and this Trust Agreement, and the distribution of distributable proceeds to the Beneficiaries in accordance with the provisions of the Plan and this Trust Agreement, in each case including the powers with respect thereto set forth in Article VII hereof.

4

2.03    Incidents of Ownership. The Beneficiaries shall be the sole beneficiaries of the Creditor Trust, and the Litigation Trustee shall retain only such incidents of ownership of the Creditor Trust Assets as are necessary to undertake the actions and transactions authorized herein on behalf of the Beneficiaries. The Creditor Trust is established by and the Beneficiaries who are treated as the grantors under the Internal Revenue Code, and the Creditor Trust shall be a liquidating trust whose income and losses are attributable to the Beneficiaries, as provided in Section 671 through Section 679 of the Internal Revenue Code and subject to applicable law.

# ARTICLE III
# BENEFICIARIES

3.01 Beneficial Interests.

(a)     The beneficial interests (the "Beneficial Interests") in this Creditor Trust will be beneficially owned by the Beneficiaries.

(b)     The Beneficial Interests of the Beneficiaries in the Creditor Trust Assets are the following:

(i)     The holders of the Allowed Professional Fee Administrative Claims, to the extent provided for in the Plan; and

(ii)    The holders of Allowed Class 5 and 6 General Unsecured Claims pursuant to the Plan.

(c)     No Certificates of Beneficial Interests. Beneficial interests in the Trust shall be allocated in accordance with the Plan and shall not be evidenced by any certificates and shall be evidenced only by this Trust Agreement and the underlying Allowed Claims upon which the entitlement to a Beneficial Interest is established. The Beneficial Interests have been issued and transferred pursuant to the exemption from securities registration contained in Section 1145 of the Bankruptcy Code and are exempt from taxes pursuant to Section 1146(a) of the Bankruptcy Code.

3.02 Rights of Beneficiaries. Each Beneficiary shall be entitled to participation in the rights and benefits due to a Beneficiary hereunder according to the amount of (a) in the case of the Allowed Professional Fee Administrative Claims (subject to the limitations contained in the Plan), and (b) in the case of Class 5 and 6 Allowed General Unsecured Claims, a Pro Rata amount of all Allowed Class 5 and 6 Claims. Each Beneficiary shall hold its beneficial interest subject to all the terms and provisions of this Trust Agreement. The interest of a Beneficiary is hereby declared and shall be in all respects personal property, and the Beneficiaries' sole right and entitlement in and to the

5

Creditor Trust and the Creditor Trust Assets shall be the contingent right to receive the Distributions, payable in accordance with the terms of the Plan and this Trust Agreement. Upon the merger, consolidation or other similar transaction involving a Beneficiary that is not an individual, such Beneficiary's interest shall be transferred by operation of law and such transaction shall in no way terminate or affect the validity of this Trust Agreement. Except as expressly provided hereunder, a Beneficiary shall have no title to, right to, possession of, management of or control of the Creditor Trust. No widower, widow, heir or devisee of any individual who may be a Beneficiary and no bankruptcy trustee, receiver or similar person of any Beneficiary shall have any right, statutory or otherwise (including any right of dower, homestead or inheritance, or of partition, as applicable), in any property forming a part of the Creditor Trust, but the whole title to all the Creditor Trust's Assets shall be vested in the Litigation Trustee and the sole interest of the Beneficiaries shall be the rights and benefits given to such persons under this Trust Agreement and the Plan.

     3.03 <u>Distributions.</u>

(a)    Distributions to Beneficiaries shall be made by the Litigation Trustee, as applicable: (i) at the addresses set forth on the Proofs of Claim filed by such Beneficiary (or at the last known addresses of such Holders if no Proof of Claim is filed); (ii) at the addresses set forth in any written notices of address changes delivered to the Litigation Trustee after the date of any related Proof of Claim; or (iii) at the addresses reflected in the Schedules if no Proof of Claim has been filed and the Litigation Trustee has not received a written notice of a change of address in accordance with this Trust Agreement. If any Beneficiaries' distribution is returned as undeliverable, no further distributions to such Beneficiary shall be made unless and until the Litigation Trustee is notified in writing of such Beneficiary's then-current address, at which time all missed Distributions shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions made through the Litigation Trustee shall be returned to the Litigation Trustee until such Distributions are claimed. Notwithstanding the foregoing, if any Distribution to a Beneficiary is returned to the Litigation Trustee as undeliverable or remains unclaimed for the later of (y) a period of sixty (60) days after it has been delivered (or attempted to be delivered) or (z) one hundred eighty (180) days after the Effective Date, such unclaimed Distribution shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed distribution as well as any further distribution to the Beneficiary shall be returned to and held by the Litigation Trustee for the benefit of the remaining Beneficiaries. After the expiration of such period, all unclaimed property shall be added to and included in the Final Distribution. The Claim of any Beneficiary or successor to such Distribution shall be discharged and forever barred,

6

notwithstanding any federal or state escheat laws to the contrary. The Litigation Trustee shall not be required to locate any Beneficiary where the address available is incorrect or inadequate. Upon termination of the right to Distributions as provided herein, such Beneficiary shall have no further recourse against Reorganized Debtor, the Creditor Trust or the Litigation Trustee with respect to such Distributions.

(b)    A Beneficiary may effect a transfer or assignment of a Claim or right as a Beneficiary by an assignment of such interest in writing, executed under penalty of perjury, filed with the Court and served on the Litigation Trustee. After the Record Date applicable to a particular Distribution, the Litigation Trustee shall have no obligation to recognize any transfer of a Claim or right as a Beneficiary with respect to such Distribution, and shall make such Distribution to the Beneficiary at the address designated as of the applicable Record Date.

## ARTICLE IV
## DURATION AND TERMINATION OF CREDITOR TRUST

4.01 <u>Duration.</u> The existence of this Creditor Trust shall terminate on the earlier of (i) four (4) years after the Effective Date, or (ii) the date on which the Creditor Trust Assets have been either reduced to Cash or equivalents or abandoned and all distributable proceeds have been distributed; provided, however, that the Litigation Trustee or another party in interest may move to extend the term of this Creditor Trust, for good cause with the approval of the Court. Notwithstanding anything to the contrary in this Trust Agreement, in no event shall the Litigation Trustee unduly prolong the duration of the Creditor Trust, and the Litigation Trustee shall at all times endeavor to distribute the Distributable Proceeds to the Beneficiaries and terminate the Creditor Trust as soon as practicable in accordance with this Trust Agreement and the Plan.

4.02 <u>No Termination by Beneficiaries</u>. The Creditor Trust may not be terminated by the Beneficiaries.

4.03 <u>Continuance of Creditor Trust for Winding Up</u>. (a) After the termination of the Creditor Trust as provided in Section 4.01 and solely for the purpose of liquidating and winding up the affairs of the Creditor Trust, the Litigation Trustee shall continue to act as such until its duties have been fully performed. The Litigation Trustee shall, upon the termination of the Creditor Trust, distribute all distributable proceeds as provided in Section 5.02 hereof.

4.04 <u>Document Retention</u>. Upon the distribution of any distributable proceeds, the Litigation Trustee shall retain the books, records and files that shall have been delivered to or created by the Litigation Trustee. In the Litigation Trustee's discretion, all of such

7

records and documents may be destroyed at any time after two (2) years from the Final Distribution. Except as otherwise specifically provided herein, upon the Final Distribution, the Litigation Trustee shall be deemed discharged and shall have no further duties or obligations hereunder except to account to the Beneficiaries as provided herein or in the Plan.

## ARTICLE V
## DISTRIBUTIONS

5.01 <u>Payment of Costs.</u>

(a) The Litigation Trustee shall pay from the Creditor Trust Assets all costs, expenses, charges, liabilities and obligations of the Creditor Trust as contemplated by this Trust Agreement and as required by law, including without limitation Administrative Costs and Expenses.

(b) The costs and expenses of the Creditor Trust will be paid out of the Creditor Trust Assets in the following order of priority:

(i) First, in payment of the Administrative Costs and Expenses, pursuant to a Bankruptcy Court Order;

(ii) Second, to the payment of any other costs, expenses, charges, liabilities and obligations of the Creditor Trust; and

(iii) Third, in the discretion of the Litigation Trustee, to the establishment of reasonable reserves for the payment of future Administrative Costs and Expenses.

The amounts described in clauses (i) through (iii) above are hereinafter referred to as the "Creditor Trust Costs."

5.02 <u>Distribution of Distributable Proceeds.</u> Pursuant to the terms of the Plan and provided that (x) the Litigation Trustee has paid all Creditor Trust Costs incurred to date or otherwise established a reserve for such costs, and (y) the Litigation Trustee has established a reserve (the "Disputed Claim Reserve") for all remaining Disputed Claims and Creditor Trust Costs, then the Litigation Trustee shall distribute such remaining portion of the Distributable Proceeds to the Beneficiaries in accordance with the Plan. The Disputed Claim Reserve shall be held in a separate account, which shall contain the amount of the pro rata distribution to which the holders of each Disputed Claim would have been entitled had such Claim(s) been allowed. Upon resolution of a Disputed Claim, the amount reserved shall be transferred to the distribution account of the Creditor

8

Trust and the distribution to the holder of the previously disputed claim made therefrom pursuant to the Plan.

## ARTICLE VI
## TAX MATTERS

6.01 Taxes. The Debtor will file such tax returns and provide the Beneficiaries with such tax information statements as may be required by law.

6.02 Allocation. To the extent necessary, the Debtor shall cause taxable income and taxable loss of the Creditor Trust to be allocated among the Beneficiaries in such manner as it determines to equitably reflect such persons' share of taxable income and taxable loss.

## ARTICLE VII
## POWERS OF AND LIMITATIONS ON THE LITIGATION TRUSTEE

7.01 Powers of the Litigation Trustee. Without limitation, but subject to the remaining provisions herein, the Litigation Trustee shall further be expressly authorized to:

      (a)    prosecute Avoidance Actions and Causes of Action, in the Bankruptcy Court and settle such actions pursuant to Fed. R. Bankr. P. 9019;

      (b)    execute any documents and take any other actions related to, or in connection with, the liquidation of the Creditor Trust Assets and the exercise of the Litigation Trustee's powers granted herein;

      (c)    hold legal title to any and all rights of the Beneficiaries in or arising from the Creditor Trust Assets;

      (d)    protect and enforce the rights to the Creditor Trust Assets, subject to the terms and limitations set forth in this Plan and the Trust Agreement, vested in the Litigation Trustee by this Trust Agreement by any method deemed commercially appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

      (e)    release, sell, transfer convey or assign any right, title or interest in or about the Creditor Trust Assets or any portion thereof, provided however, that any sale or transfer is subject to Bankruptcy Court approval and the possibility of higher or better bids;

9

(f)     open and maintain bank accounts and deposit funds and draw checks and make disbursements in accordance with the Plan and the Trust Agreement;

(g)     engage and retain, subject to any Court approval, attorneys, accountants, other Professionals and clerical and stenographic to provide assistance as may, in the discretion of Litigation Trustee, be deemed necessary;

(h)     establish and maintain the Expense Reserve and other reserves that may be required;

(i)     make Distributions in accordance with the terms of the Plan and Trust Agreement;

(j)     determine and satisfy any and all ordinary course liabilities created, incurred or assumed by the Creditor Trust;

(k)     pay all ordinary course expenses of or relating to the Creditor Trust Assets and the Creditor Trust and make all other payment relating to the Creditor Trust, including the fees and expenses of the Litigation Trustee, upon receiving an Order from the Bankruptcy Court authorizing such;

(l)     retain and pay employees and professionals, including but not limited to attorneys, accountants and experts necessary to carry out its obligations hereunder;

(m)     pay the Creditor Trust Costs, maintain the books and records of the Creditor Trust and prepare reports each as provided herein, and engage in such other acts or actions as otherwise contemplated by this Trust Agreement; and

(n)     without limiting any of the foregoing, deal with the Creditor Trust Assets or any part or parts thereof in all other ways as would be lawful and do any and all things necessary to further the goals and objectives and accomplish the purposes of the Plan.

7.02 <u>No Operations as an Investment Company, Trade or Business.</u> No part of the Creditor Trust Assets shall be used or disposed of by the Litigation Trustee in furtherance of any trade or business. The Litigation Trustee shall, on behalf of the Creditor Trust, hold the Creditor Trust out as a trust in the process of liquidation and not as an investment company. The Litigation Trustee shall be restricted to the payments and Distributions of the Distributable Proceeds for the purpose set forth in this Trust Agreement and the Plan, and the conservation and protection of the Creditor Trust Assets and the administration thereof in accordance with the provisions of this Trust Agreement.

10

7.03 <u>Investment of Creditor Trust Moneys.</u> The Litigation Trustee shall invest the moneys received by the Creditor Trust or otherwise held in the Creditor Trust estate in (i) a trust account set up for the Shurwest bankruptcy estate, (ii) insured demand deposit accounts or certificates of deposit maintained by or issued by any savings institution or commercial bank insured by the United States government or any agency thereof and (iii) short-term marketable direct obligations of, or guaranteed as to principal and interest by, the United States government or any agency thereof.

7.04 <u>Transactions with Related Persons.</u> Notwithstanding any other provisions of this Trust Agreement, but only to the extent that such transactions have not been previously approved as part of the Plan, the Litigation Trustee shall not knowingly, directly or indirectly, sell or otherwise transfer all or any part of the Creditor Trust Assets to, or contract with (i) any employee or agent (acting in their individual capacities) of this Creditor Trust; or (ii) any Person of which the Litigation Trustee, or any employee or agent of this Creditor Trust is an affiliate by reason of being a trustee, director, officer, partner or direct or indirect beneficial owner of 5% or more of the outstanding capital stock, shares or other equity interest of such Person.

**ARTICLE VIII**
**CONCERNING THE LITIGATION TRUSTEE**

8.01 <u>Generally.</u> The Litigation Trustee accepts and undertakes to discharge the Creditor Trust created by this Trust Agreement upon the terms and conditions hereof. The Litigation Trustee shall not have any liability for any of its acts or omissions in connection with the selection and hiring of professionals, or the performance of any of its other duties hereunder, except in the case of its gross negligence or its own intentional and willful misconduct, and in no event shall the Litigation Trustee be liable for any action taken in reliance upon the advice of professionals selected with due care in respect of the subject matter in question. Notwithstanding the foregoing, the Litigation Trustee may, without liability therefor, retain the services of any professional services firm with which the Litigation Trustee is affiliated.

8.02 <u>Reliance by Litigation Trustee.</u> Except as otherwise provided in this Trust Agreement:

(a) the Litigation Trustee may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request, consent, order or other paper or document reasonably believed by the Litigation Trustee to be genuine and to have been signed or presented by the proper party or parties;

(b) the Litigation Trustee may consult with independent legal counsel to be selected by it with due care and the advice or opinion of such counsel shall be full and complete personal protection to the Litigation Trustee and agents of the

11

Creditor Trust in respect of any action taken or suffered by it in good faith and in reliance on, or in accordance with, such advice or opinion, including, without limitation, the advice or opinion of a member of any law firm with which the Litigation Trustee is affiliated; and

(c) persons dealing with the Litigation Trustee shall look only to the Creditor Trust Assets to satisfy any liability incurred by the Litigation Trustee to such person in carrying out the terms of this Trust Agreement, and the Litigation Trustee shall have no personal or individual obligation to satisfy any such liability.

8.03 <u>Liability to Third Persons</u>. No Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Creditor Trust Assets or the affairs of the Creditor Trust, and no Litigation Trustee or agent of the Creditor Trust shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Creditor Trust Assets or the affairs of this Creditor Trust, except for its gross negligence or its own intentional and willful misconduct; and all such persons shall look solely to the Creditor Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Creditor Trust.

8.04 <u>Non-liability of Litigation Trustee for Acts of Others</u>. Nothing contained in this Trust Agreement shall be deemed to be an assumption by the Litigation Trustee of any of the liabilities, obligations or duties of any of the other parties hereto; and shall not be deemed to be or contain a covenant or agreement by the Litigation Trustee to assume or accept any such liability, obligation or duty. Any successor Litigation Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Litigation Trustee hereunder, and any statement or representation made as to the assets comprising the Creditor Trust Assets or as to any other fact bearing upon the prior administration of the Creditor Trust. The Litigation Trustee shall not be liable for having accepted and relied upon such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. The Litigation Trustee or successor Litigation Trustee shall not be liable for any act or omission of any predecessor Litigation Trustee, nor have a duty to enforce any claims against any predecessor Litigation Trustee on account of any such act or omission.

8.05 <u>Indemnity.</u> The Litigation Trustee and it professionals (collectively, the "Indemnified Parties") shall be indemnified by the Creditor Trust from any and all claims, causes of actions damages, liabilities or expenses and assertions of liability (including, without limitation, reasonable attorneys' fees, disbursements and related expenses) which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought by or threatened against the Indemnified Parties arising out of the Indemnified Parties performance of their duties under this Trust Agreement and the Plan, except to the

12

extent that any act constitutes gross negligence, willful misconduct or actual fraud. Notwithstanding any provision herein to the contrary, the Indemnified Parties shall be entitled to obtain advances from the Creditor Trust to cover their expenses of defending themselves in any action brought against them as a result of the acts or omissions of the Litigation Trustee in its capacity as such, provided, however, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Creditor Trust upon the entry of a final order of any court of competent jurisdiction finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this Section 8.05.

      8.06 <u>Bond.</u> The Litigation Trustee shall not be obligated to post a bond hereunder.

### ARTICLE IX
### COMPENSATION OF LITIGATION TRUSTEE

      9.01 <u>Fees and Expenses.</u> The Litigation Trustee shall be entitled to reimburse itself from the Creditor Trust for all Administrative Costs and Expenses incurred by it in the performance of its duties in accordance with this Trust Agreement. The Litigation Trustee shall be entitled to payment of fees and the reimbursement of expenses after receiving an Order from the Bankruptcy Court approving such. The Litigation Trustee shall provide services at the rate of $350.00 per hour.

### ARTICLE X
### LITIGATION TRUSTEE AND SUCCESSOR LITIGATION TRUSTEES

      10.01 <u>Appointment.</u> The Litigation Trustee shall be Subchapter V Trustee Dawn Maguire.

      10.02 <u>Resignation</u>. The Litigation Trustee may resign and be discharged from the trust hereby created by giving at least fifteen (15) Business Days prior written notice thereof to the Trust Beneficiaries and Reorganized Debtor. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice, or (b) the effective date of the appointment of a successor Litigation Trustee in accordance with Section 10.04 hereof and such successor's acceptance of such appointment.

      10.03 <u>Removal</u>. The Litigation Trustee may be removed from office (a) for fraud or willful misconduct in connection with the affairs of the Creditor Trust or for such physical or mental disability as substantially prevents the Litigation Trustee from performing its duties as Litigation Trustee upon written motion by a party in interest and a finding by the Court of fraud or willful misconduct by the Litigation Trustee or physical or mental disability after a hearing on not less than ten (10) Business Days' notice, or (b) upon a two-thirds vote of the Beneficiaries (assuming one vote per Allowed Claim).

13

10. 04 <u>Appointment of Successor Litigation Trustee; Acceptance of Appointment by Successor Litigation Trustee</u>. The death, resignation, removal, incompetency, bankruptcy or insolvency of the Litigation Trustee shall not operate to terminate the Creditor Trust created by this Trust Agreement or to revoke any existing agency created pursuant to the terms of this Trust Agreement or invalidate any action theretofore taken by the Litigation Trustee. In any such event, the Litigation Trustee, if not then the Litigation Trustee's Professionals, if not then the Reorganized Debtor shall file a motion and nominate a potential successor Trustee with not less than ten (10) days' written notice to Reorganized Debtor and the Beneficiaries, if not joining in the motion to appoint the successor Trustee. If no objection is filed, the nominated person shall become Successor Trustee, if an objection is filed the Bankruptcy Court may use its powers to appoint a Successor Trustee in its discretion. Any successor Litigation Trustee appointed hereunder shall execute an instrument accepting its appointment, and no successor Trustee shall be liable personally for any act or omission of its, his or her predecessor. Thereupon, such successor shall, without any further act, become vested with all the obligations, duties, powers, rights, title, discretion and privileges of its predecessor in the Creditor Trust with like effect as if originally named Litigation Trustee and shall be deemed appointed pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code to pursue and perform the responsibilities outlined in this Trust Agreement for the benefit of the Beneficiaries. The retiring Litigation Trustee shall duly assign, transfer and deliver to such successor all property and money held by such retiring Litigation Trustee hereunder and shall, as directed by the Court or reasonably requested by such successor, execute and deliver an instrument or instruments conveying and transferring to such successor upon the trust herein expressed, all the obligations, duties, powers, rights, title, discretion and privileges of such retiring Litigation Trustee.

**ARTICLE XI**
**CONCERNING THE BENEFICIARIES**

11.01 <u>No Suits by Beneficiaries</u>. No Beneficiary shall have any right by virtue of any provision of this Trust Agreement to institute or participate in any action or proceeding at law or in equity against any party with respect to the Creditor Trust or the Creditor Trust Assets. Any Beneficiary may bring an appropriate action in the Bankruptcy Court to enforce this Trust Agreement.

11.02 <u>Requirement of Undertaking</u>. The Litigation Trustee may request the Court to require, in any suit for the enforcement of any right or remedy under this Trust Agreement, or in any suit against the Litigation Trustee for any action taken or omitted by it as Litigation Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, including reasonable attorneys' fees, against any party litigant in such suit; provided, however, that the provisions of this Section 11.02 shall not apply to any suit by the Litigation Trustee.

14

## ARTICLE XII
## ADMINISTRATION OF TRUST ESTATE

12.01 <u>Books and Records</u>. The Litigation Trustee shall maintain, in respect of the Creditor Trust and the Beneficiaries, books and records relating to the claims and the assets and the income of the Creditor Trust and the payment of expenses of the Creditor Trust, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions hereof and to comply with applicable provisions of law. The Litigation Trustee shall provide any Beneficiary requesting same, a written report every six (6) months after the Effective Date. Each Beneficiary shall be responsible for providing the Litigation Trustee with written notice of any change in address.

12.02 <u>Fiscal Year</u>. The fiscal year of the Creditor Trust shall be the calendar year.

12.03 <u>Final Distribution</u>. If the Litigation Trustee determines that all claims, expenses, charges, liabilities and obligation of the Creditor Trust have been paid or discharged, or if the existence of the Creditor Trust shall terminate pursuant to Section 4.01 or 4.02 hereof, the Litigation Trustee shall, as expeditiously as is consistent with the conservation and protection of the Creditor Trust Assets, distribute the aggregate balance in the Creditor Trust Assets, after reserving therefrom for unpaid and future expenses and liabilities arising from the operation and termination of the Creditor Trust, to the Beneficiaries in proportion to their Beneficial Interests therein. The Litigation Trustee shall hold in the Creditor Trust and thereafter make disposition of all distributions and other payments due any beneficiaries who have not been located, in accordance with the Plan.

12.04 <u>Access to Books and Records of Reorganized Debtor</u>. Following the Effective Date, the Reorganized Debtor shall use its best efforts to provide to the Litigation Trustee all relevant data concerning all Causes of Action, including Avoidance Actions, from the Reorganized Debtor's books and records, its schedules and orders of the Court pertaining to such claims. From and after the Effective Date, the Reorganized Debtor shall make available to the Litigation Trustee all records pertaining to all Causes of Action, including Avoidance Actions, for review, inspection and copying (at the sole cost and expense of the Creditor Trust) as appropriate, upon the reasonable request of the Litigation Trustee or his counsel and at such reasonable times and places as the Litigation Trustee and Reorganized Debtor shall agree. Prior to disposing of any such records relevant to Causes of Action, including Avoidance Actions, the Reorganized Debtor shall provide the Litigation Trustee with prior written notice at least fifteen (15) days in

15

advance so that the Litigation Trustee may examine such records to determine if it is appropriate for the Creditor Trust to take possession thereof in connection with trust administration matters.

# ARTICLE XIII
# MISCELLANEOUS

13.01 <u>Construction</u>. This Trust Agreement shall be governed by and construed in accordance with the laws of the State of Arizona and the United States of America; provided that the Creditor Trust and any interpretation or enforcement of the provisions of this Trust Agreement and any dispute that may arise among the parties or which may arise in connection with the administration of the Creditor Trust shall be subject to the jurisdiction of the Court. The Litigation Trustee's interpretation of the provisions of this Trust Agreement and the provisions of the Plan as they relate to the prosecution of the Avoidance Actions and Causes of Action shall be deemed conclusive in the absence of a contrary interpretation of the Court.

13.02 <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final order of a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforced to the fullest permitted by law.

13.03 <u>Notices.</u> Any notice, requests or other communication required or permitted to be made in accordance with this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if mailed by first class mail or overnight delivery as set forth below and as provided herein. Each notice, request, consent or other communication shall be deemed delivered: (i) on the date upon which the return receipt is signed or delivery is refused, as the case may be, if mailed; or (ii) upon mailing, if sent by first-class mail or otherwise where no return receipt is provided.

> <u>If to the Reorganized Debtor:</u>
>
> Shurwest, LLC
> Attention James Maschek, President
> 17550 N. Perimeter Dr., Suite 300
> Scottsdale, Arizona 85255
> -and-
> Mesch Clark Rothschild, PC
> Attention Michael McGrath and Isaac Rothschild
> 259 N. Meyer Ave.

16

Tucson, Arizona 85701
mmcgrath@mcrazlaw.com
irothschild@mcrazlaw.com


If to the Litigation Trustee:
Dawn M. Maguire
Trustee Maguire
5415 E. High Street, Suite 200
Phoenix, AZ 85054
Trusteemaguire@gamlaw.com


Any party to this Trust Agreement may change its address for the above purposes by notifying in writing the other parties of such change in address. The Beneficiaries shall be responsible for providing to the Trustee current, complete and accurate mailing and other contact information.

Headings. The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

Counterparts. This Trust Agreement may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

Conflicts With Plan. In the event of a conflict between the terms of this Trust Agreement and the Plan, the Plan shall control.

Instructions from Court. The Trustee may, in his sole discretion, apply to the Court for instructions or guidance in connection with any issue which may arise in the administration of this Creditor Trust.

SHURWEST, LLC


By:
James Maschek
Its President

MESCH CLARK ROTHSCHILD, PC

17

By:
Isaac Rothschild
Counsel for the Debtor

LITIGATION TRUSTEE


By:
Dawn Maguire
Subchapter V Trustee


ALLEN, BARNES & JONES


By:
Thomas H. Allen
Counsel for the Litigation Trustee

18

# Exhibit H

**ALLOWED CLAIMS**

| | | Asserted | Claim Amount | | Docket |
|---|---|---|---|---|---|
| Anthony Ostlund | | Scheduled | $ | 740.00 | |
| Ballard Spahr | | Scheduled | $ | 268,169.90 | |
| Burr & Forman | | Scheduled | $ | 8,627.50 | |
| CMAM | | Scheduled | $ | 1,230,482.88 | |
| Dentons | | Scheduled | $ | 204.02 | |
| Duke Evett | | Scheduled | $ | 1,811.20 | |
| Geiger Prell | | Scheduled | $ | 2,380.00 | |
| Horter Investment Management | | Scheduled | $ | 761,250.00 | |
| Johnson, Toal & Battiste | | Scheduled | $ | 34,477.22 | |
| Mitchell Stein Carey Chapman | | Scheduled | $ | 5,940.00 | |
| Squire Patton Boss | | Scheduled | $ | 7,524.00 | |
| Supportive Insurance Services | | Scheduled | $ | 122.50 | |
| Transamerica Life Insurance Company | | Scheduled | $ | 32.96 | |
| King & Spalding | | 125 | $ | 587,353.70 | |
| Bass Berry Sims | | 128 | $ | 13,489.50 | |
| DLA | | 136 | $ | 868,189.52 | |
| RLS Capital Holdings | | Scheduled | $ | 200,000.00 | |

**Settled - No Distribution from the Plan**

| | | | | | |
|---|---|---|---|---|---|
| Minnesota Life | | 123 | $ | 16,342,411.81 | DE 506 |
| Jay Brown | | 129 | $ | - | DE 402 |

**Disputed Claims**

| Last Name/Business Name | First Name | | | | |
|---|---|---|---|---|---|
| The Quantum Group, USA | | 135 | $ | 27,354.00 | Plan |
| The Quantum Group, USA | | 134 | Unknown | | Plan |
| Ciofoletti | Rocco | 131 | $ | 80,000.00 | DE 477-483 |
| Ciofoletti | Elanor | 132 | $ | 30,000.00 | DE 477-483 |
| Stopsal | Larry | 130 | $ | 30,000.00 | DE 477-483 |
| Carolyn Howard | | 127 | | 3,945,942.09 | DE 477-483 |
| Zelinski | George, et al. | 124 | $ | 4,703,457.00 | DE 477-483 |
| Cornine | Thomas | 142 | $ | 409,756.36 | DE 530 |
| The Freeman Agency | | 143 | $ | 30,000.00 | DE 530 |
| Ayers | Robert | 59 | $ | 458,649.41 | DE 477-483 |
| Barkal | Paul and Susan | 60 | $ | 1,680,000.00 | DE 477-483 |
| Barwich | Albert and Ann | 61 | $ | 994,924.56 | DE 477-483 |
| Bennett | Gloria | 62 | $ | 860,238.58 | DE 477-483 |
| Bernat | Diane | 63 | $ | 192,343.58 | DE 477-483 |
| Billings | Elizabeth | 64 | $ | 1,551,988.12 | DE 477-483 |
| Blaettler | Kurt | 65 | $ | 1,257,560.64 | DE 477-483 |
| Blohm | Janice and Walter | 66 | $ | 985,002.56 | DE 477-483 |
| Bott | Pamela | 67 | $ | 138,185.04 | DE 477-483 |
| Breedin | William and Lynn | 68 | $ | 1,522,606.64 | DE 477-483 |
| Brooks | Craig | 69 | $ | 2,919,000.00 | DE 477-483 |
| Burgess | Elizabeth | 70 | $ | 630,000.00 | DE 477-483 |
| Chaney | Samuel | 71 | $ | 1,157,329.15 | DE 477-483 |
| Corley | Devon and Barbara | 72 | $ | 2,678,148.61 | DE 477-483 |
| Dantzler | Thomas | 73 | $ | 535,881.74 | DE 477-483 |
| Davy | Linda | 74 | $ | 409,689.00 | DE 477-483 |
| Deretchin | Lora and Jeff | 75 | $ | 222,335.15 | DE 477-483 |
| Downing | Jane | 76 | $ | 320,888.90 | DE 477-483 |
| Eliason | Laura and Thomas | 77 | $ | 579,810.84 | DE 477-483 |
| Elkins | Linda and Douglas | 78 | $ | 1,400,644.06 | DE 477-483 |
| Ellis | Dennis | 79 | $ | 597,395.23 | DE 477-483 |
| Emery | June | 80 | $ | 210,000.00 | DE 477-483 |

| Floyd | Bobby | 81 | $ | 1,457,526.84 | DE 477-483 |
|---|---|---|---|---|---|
| Ganley | Steven | 82 | $ | 1,369,259.68 | DE 477-483 |
| Goulding | Debra and Michael | 83 | $ | 1,376,707.54 | DE 477-483 |
| Grant | Debbie | 84 | $ | 569,972.76 | DE 477-483 |
| Gray-McGraw | Kelley | 85 | $ | 267,039.86 | DE 477-483 |
| Gugel | Wayne | 86 | $ | 293,610.58 | DE 477-483 |
| Henderson | Jane | 87 | $ | 145,358.89 | DE 477-483 |
| Hess | Galen and Jean | 88 | $ | 483,345.07 | DE 477-483 |
| Hix | Stanley | 89 | $ | 1,437,953.50 | DE 477-483 |
| Hofford | Suzanne | 90 | $ | 1,317,502.91 | DE 477-483 |
| Howard | Virginia | 91 | $ | 1,427,612.89 | DE 477-483 |
| Johnson | Robert | 92 | $ | 4,275,512.30 | DE 477-483 |
| Karnowksi | Robin and Jerome | 93 | $ | 1,496,718.17 | DE 477-483 |
| Kelley | Adrith and Jerry | 94 | $ | 1,299,080.24 | DE 477-483 |
| Kilpatrick | Sara | 95 | $ | 797,429.68 | DE 477-483 |
| Kim | Vandy | 96 | $ | 2,094,267.25 | DE 477-483 |
| Kornett | Glenn and Gudrun | 97 | $ | 1,936,937.90 | DE 477-483 |
| Larson | David and Lucye | 98 | $ | 1,708,286.50 | DE 477-483 |
| Lawson | Christine | 99 | $ | 374,336.80 | DE 477-483 |
| Lince | Florence and Mike | 100 | $ | 291,071.26 | DE 477-483 |
| Manning | Robert | 101 | $ | 232,630.94 | DE 477-483 |
| Mayfield | Diane | 104 | $ | 627,119.98 | DE 477-483 |
| McGraw | Michael | 102 | $ | 554,700.51 | DE 477-483 |
| Meyer | Margaret | 103 | $ | 67,200.00 | DE 477-483 |
| Mitchell | Jeffrey | 105 | $ | 583,931.29 | DE 477-483 |
| Myette | Fred | 106 | $ | 1,525,176.16 | DE 477-483 |
| Orem | Mary | 107 | $ | 187,743.02 | DE 477-483 |
| Peeples | Jayne | 108 | $ | 167,203.01 | DE 477-483 |
| Perry | Drucilla | 110 | $ | 323,161.06 | DE 477-483 |
| Pierson | Maxine and Dennis obo "Dennis and Maxine Pierson Living Trust" | 109 | $ | 895,551.97 | DE 477-483 |
| Priester | Johnny | 111 | $ | 559,218.70 | DE 477-483 |
| Rack | Anne | 112 | $ | 752,423.78 | DE 477-483 |
| Rich | Bill and Karen | 113 | $ | 1,258,676.66 | DE 477-483 |
| Schaidle | Bill | 114 | $ | 1,833,277.74 | DE 477-483 |
| Seigler | Jennifer | 115 | $ | 509,168.48 | DE 477-483 |
| Shealy | Terry | 122 | $ | 453,789.00 | DE 477-483 |
| Stegelin | Dolores | 116 | $ | 445,806.10 | DE 477-483 |
| Switzer | Earl | 117 | $ | 534,499.90 | DE 477-483 |
| Trotter | Carol and Wayne | 118 | $ | 168,000.00 | DE 477-483 |
| Weekes | Alan | 119 | $ | 631,408.72 | DE 477-483 |
| Wendorf | Mary and John | 120 | $ | 693,470.74 | DE 477-483 |
| Worth | Beth and Tim | 121 | $ | 665,591.93 | DE 477-483 |
| Anderson | John | 16 | $ | 872,327.73 | DE 477-483 |
| Cannon | Gary | 17 | $ | 669,598.25 | DE 477-483 |
| Carrigan | David | 18 | $ | 350,871.34 | DE 477-483 |
| Sendejo | Daniel and Yolanda | 55 | $ | 831,592.44 | DE 477-483 |
| Andreasen | Jeffrey | 19 | $ | 209,690.67 | DE 477-483 |
| Buck | Rachel | 20 | $ | 91,100.25 | DE 477-483 |
| Gonzalez | Felix and Karla | 21 | $ | 426,528.38 | DE 477-483 |
| Herman | Heather | 22 | $ | 173,759.78 | DE 477-483 |
| Herman | Hayley | 23 | $ | 112,811.43 | DE 477-483 |
| Humphreys | Charlie | 24 | $ | 262,876.71 | DE 477-483 |
| Lewis | Kirt | 25 | $ | 100,712.28 | DE 477-483 |
| Maughan | Jeffrey | 26 | $ | 334,811.81 | DE 477-483 |
| Roseberry | Karen | 27 | $ | 155,618.75 | DE 477-483 |
| Schmidt | Lonna | 28 | $ | 150,067.68 | DE 477-483 |

| Shelstad | Karen | 56 | $ 2,927,443.36 | DE 477-483 |
|---|---|---|---|---|
| Wamsley | Josephine | 29 | $ 61,592.71 | DE 477-483 |
| Campbell | Toni & Jeff | 30 | $ 135,825.47 | DE 477-483 |
| Keevan | Steven | 31 | $ 990,535.36 | DE 477-483 |
| Shirley | Casey | 32 | $ 1,283,461.63 | DE 477-483 |
| Tabor | Gregory | 33 | $ 360,314.12 | DE 477-483 |
| Cooper | Brian | 35 | $ 565,340.43 | DE 477-483 |
| Dennis | Mary Ann | 34 | $ 425,305.37 | DE 477-483 |
| Freeman | Susanna | 36 | $ 197,264.56 | DE 477-483 |
| Mandell | Michael | 37 | $ 1,980,555.83 | DE 477-483 |
| Milford | Scott | 38 | $ 53,582.96 | DE 477-483 |
| Garrett | Sheila | 39 | $ 637,567.60 | DE 477-483 |
| Hoornaert | Gary | 40 | $ 1,324,370.28 | DE 477-483 |
| Look | Robert | 41 | $ 267,490.81 | DE 477-483 |
| Przybylski | Pamela | 42 | $ 1,586,461.30 | DE 477-483 |
| Howard | Darby | 43 | $ 688,977.25 | DE 477-483 |
| Katzer | Clyde | 44 | $ 292,128.62 | DE 477-483 |
| Kite | Robert | 57 | $ 323,344.89 | DE 477-483 |
| Schmoe | Dale | 45 | $ 262,032.05 | DE 477-483 |
| Leland | Geoff | 46 | $ 918,006.63 | DE 477-483 |
| Haselhorst | Kevin | 47 | $ 2,553,262.67 | DE 477-483 |
| Matthews | Peter and Alberta | 48 | $ 1,991,611.64 | DE 477-483 |
| Nicchi | Vincent and Kathleen | 49 | $ 3,003,664.76 | DE 477-483 |
| McCauley | Timothy | 58 | $ 181,849.60 | DE 477-483 |
| Meiling | Jeffrey Scott | 50 | $ 609,700.80 | DE 477-483 |
| Pirtle | Laura | 51 | $ 267,023.73 | DE 477-483 |
| Metzner | Mara | 52 | $ 1,306,601.61 | DE 477-483 |
| Thomas | Sean | 53 | $ 1,036,762.19 | DE 477-483 |
| Valadez | Leo | 54 | $ 378,343.60 | DE 477-483 |
| Berner | Catherine | 8 | $ 761,705.41 | DE 477-483 |
| Calhoun | Sharon | 9 | $ 109,963.60 | DE 477-483 |
| Harlan | Loretta and Norman | 10 | $ 191,252.67 | DE 477-483 |
| Hillhouse | Judy | 11 | $ 244,797.83 | DE 477-483 |
| LeDuc | Henry and Violet | 12 | $ 575,512.82 | DE 477-483 |
| Reynolds | Darlene | 13 | $ 707,461.33 | DE 477-483 |
| Selle | Richard | 14 | $ 755,779.67 | DE 477-483 |
| Whigham | Judson | 15 | $ 604,480.52 | DE 477-483 |
| Manley | Donald L. and Debra K. | 1 | $ 48,255.36 | DE 477-483 |
| Bland | F. Gary and Joan K. | 2 | $ 94,734.48 | DE 477-483 |
| Child | Lisa A. and Robert K. | 3 | $ 76,731.23 | DE 477-483 |
| Hansen | John E. and Suzanne | 4 | $ 377,100.00 | DE 477-483 |
| Hansen | C. Levoy | 5 | $ 153,658.56 | DE 477-483 |
| Horn Financial Services / Horn | Timothy | 7 | $ 1,667,030.63 | DE 477-483 |
| Lanford | Valerie | 126 | $ 930,192.70 | DE 477-483 |

**DISALLOWED CLAIMS**

| Page | Cletus and Kolette | 140 | $ 18,639,837.46 | DE 524 |
|---|---|---|---|---|
| Rodillas | Gloria | 138 | $ 3,626,281.21 | DE 524 |
| Jantzer | Andrea | 139 | $ 7,199,080.37 | DE 524 |
| McKinnon | Emma | 137 | $ 8,487,736.66 | DE 524 |
| Class Claim filed by Ciofoletti | | 133 | $ 35,000,000.00 | DE 299 |