MESCH CLARK ROTHSCHILD
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
irothschild@mcrazlaw.com
ecfbk@mcrazlaw.com
By: Michael McGrath, # 6019
Isaac D. Rothschild, # 25726
85026-2/gc

Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| SHURWEST, LLC, an Arizona limited liability corporation fka SHURWEST, INC., an Arizona corporation, | No. 2:21-bk-06723-DPC |
| Debtor. | **NOTICE OF FILING REDLINE OF DEBTOR'S THIRD AMENDED PLAN OF REORGANIZATION (SUBCHAPTER V) DECEMBER 2022** |

      Shurwest, LLC, Debtor-in-Possession ("Debtor"), through counsel undersigned, files as Exhibit A the redlined *Debtor's Third Amended Plan of Reorganization (Subchapter V) December 2022,* which is a "legal blackline" to the *Debtor's Second Amended Plan of Reorganization (Subchapter V) November 2022* (DE 558).

DATED: December 12, 2022         MESCH CLARK ROTHSCHILD

                            By:   /s/Isaac D. Rothschild, #25726
                                Michael McGrath
                                Isaac D. Rothschild
                                Attorneys for Debtor

1

Notice of Electronic Filing ("NEF")
electronically served on the date of
filing upon the registered CM/ECF
Users herein as evidenced by the NEF.

2

3

4890-7156-2051, v. 1

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# Exhibit A

MESCH CLARK ROTHSCHILD
259 North Meyer Avenue
Tucson, Arizona 85701
Phone: (520) 624-8886
Fax: (520) 798-1037
Email: mmcgrath@mcrazlaw.com
jrothschild@mcrazlaw.com
ecfbk@mcrazlaw.com
By: Michael McGrath, # 6019
Isaac D. Rothschild, # 25726
85026/mbt

Attorneys for Debtor

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| In re | Chapter 11 |
|---|---|
| SHURWEST, LLC, an Arizona limited liability corporation fka SHURWEST, INC., an Arizona corporation, | No. 2:21-bk-06723-DPC |
| Debtor. | |

**DEBTOR'S ~~SECOND~~ THIRD AMENDED PLAN OF REORGANIZATION (SUBCHAPTER V) ~~NOVEMBER~~ DECEMBER 2022**

119532614.2

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................. 2

II.   BACKGROUND ................................................................. 3

III.  PLAN OVERVIEW ............................................................. 8

IV.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS........... 10

V.    IMPLEMENTATION OF PLAN ............................................. 15

    A.    Funding the Plan.................................................... 15

    B.    Claims Allowance/Liquidation of Claims' Amounts..................... 16

    C.    Payment/Distributions and Claims Reserve........................... 18~~17~~

    D.    Delivery of Distributions............................................ 18~~17~~

    E.    Management of the Debtor Post-Petition............................. 19~~18~~

    F.    Conditions Precedent to Effective Date.............................. 19~~18~~

VI.   LIQUIDATION ANALYSIS ................................................... 19

VII.  RISK ANALYSIS ............................................................. 22~~21~~

VIII. CONFIRMATION IN SPITE OF REJECTION OF PLAN...................... 22~~21~~

IX.   EFFECT OF CONFIRMATION ................................................ 22

X.    RETENTION OF JURISDICTION ............................................ 23~~22~~

XI.   TAX CONSEQUENCES........................................................ 24~~23~~

XII.  MODIFICATION OF PLAN ................................................... 24~~23~~

XIII. MISCELLANEOUS ............................................................ 24

    A.    Definitions, Rules of Interpretation, Severability..................... 24

    B.    Enforceability........................................................ 25~~24~~

    C.    Successors, Assigns and Applicable Law............................. 25~~24~~

    D.    Exculpation and Limitation of Liability.............................. 25~~24~~

    E.    Notices.............................................................. 26~~25~~

XIV.  RECOMMENDATION OF THE DEBTOR ................................... 27~~26~~

XV.   EXHIBITS .................................................................... 28~~26~~

    A.    Definitions of Terms................................................ 28~~26~~

    B.    Declaration of Melanie Schulze-Miller................................ 28~~26~~

    C.    Income Projections.................................................. 28~~26~~

    D.    Liquidation Analysis................................................ 28~~26~~

i

119532614.2

E.    Projected Distributions ...................................................................... 28~~26~~

F.    List of Claims Against Third Parties.................................................. 28~~26~~

Field Code Changed

Field Code Changed

ii

119532614.2

**I.     INTRODUCTION**

On August 31, 2021, Shurwest, LLC filed a Chapter 11 petition under Subchapter V. Shurwest proposes this Chapter 11 Plan, pursuant to section 1189 of the United States Bankruptcy Code, for the repayment of the allowed claims of its creditors.

The purpose of this case is to preserve Shurwest assets, rather than spending them in defense of 30+ litigation cases being brought against the Debtor in nine different states. The Debtor has resolved numerous claims during the pendency of the case. The Plan, once confirmed, will enable the Debtor to quickly resolve all remaining claims and to distribute Shurwest's assets to creditors as their claims are liquidated.

Additionally, the Plan will appoint the Sub V Trustee as the Litigation Trustee on or before the Effective Date to control and, if appropriate, pursue claims the Estate has identified against third parties for the benefit of the creditors instead of the Reorganized Debtor. The Litigation Trust Agreement is attached as **Exhibit G.** A list of potential claims is attached as **Exhibit F** hereto. This includes any action that is a general claim including the Uniform Fraudulent Transfer Action to which the Debtor is entitled, that could lead to alter-ego or successor liability.[1] It does not include any alter-ego claim that is personal in nature.[2] The Litigation Trust Agreement as attached shall be approved on an interim basis as of the order confirming this Plan. Any party may object to the form of the Litigation Trust Agreement for up to 30 days from the date of the Order confirming this Plan including potential beneficiaries and the Sub-V Trustee so that her counsel may have time to review

---

[1] "A general claim exists if the liability is to all creditors of the corporation without regard to personal dealings between such officers and such creditors. In other words, if the alter ego claim alleges acts that harmed the financial condition of the corporation as a whole and all creditors equally, such claims are general alter ego claims." *In re Capriati Constr. Corp.*, 2018 Bankr. LEXIS 818 (9th Cir. BAP 2018) quoting *In re Folks*, 211 B.R. 378 (9th Cir. BAP 1997), *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132-33 (2d Cir. 1993), and *In re Davey Roofing Inc.*, 167 B.R. 604 (Bankr. C.D. Cal. 1994).

[2] A cause of action is personal if the claimant himself is harmed and no other claimant or creditor has an interest in the cause of action." *In re Capriati Constr. Corp.*, 2018 Bankr. LEXIS 818 (9th Cir. BAP 2018) quoting *In re Folks*, 211 B.R. 378 (9th Cir. BAP 1997).

2

119532614.2

the Litigation Trust Agreement before it become final. Any objection must include a redline of the Litigation Trust Agreement with the requested changes. This Court retains jurisdiction to modify the Litigation Trust Agreement.

Unsecured creditors will receive a pro rata payment of the Debtor's projected net operating income over three years after payment of the sole secured creditor and any priority claims, as well as share pro rata in any potential recovery from the pursuit, if any, of third party claims by the Litigation Trustee.

## II.     BACKGROUND

*Nature of its Business*

Shurwest has been in the business of assisting those in the insurance business as an independent marketing organization ("IMO") since 1992. As an industry-leading IMO, Shurwest markets annuities and insurance products to registered investment advisors and insurance agents on behalf of insurance carriers. Those advisors and agents, in turn, provide financial planning advice and recommendations to their clients, generally retail consumers.

The gross revenue of Shurwest in 2020 was $3,048,762.00 with normal operating expenses of $1,569,460.00. In the first two quarters of 2021, the gross revenue of Shurwest was $1,452,150.00 with normal operating expenses of $678,442.00.

Since the Petition Date through June 30, 2022, the Debtor has had gross revenue of approximately $1,538,429 and normal operating expenses of approximately $525,900.

At the time of filing this bankruptcy case, Shurwest leased approximately nine (9) employees from a related employee-leasing company, Element Management Services, LLC ("Element").

*Events Leading to the Filing for Bankruptcy*

Shurwest was a successful company, until it was irreparably harmed by the actions taken by Melanie Schulze-Miller ("Schulze-Miller"). Schulze-Miller is the former National

3

119532614.2

1 | Sales Director of Life Insurance for Shurwest. Ms. Miller and two other Shurwest

2 | employees, Nick Johnson and Michael Seabolt, marketed and promoted certain structured

3 | cash flow products of an unregistered and unlicensed company, Future Income Payments,

4 | LLC's ("FIP"), <u>after</u> Shurwest rejected Schulze-Miller's proposal that Shurwest partner with

5 | FIP. September 12, 2018, Schultze Miller declaration made under oath at Exhibit B. at 3-4.

6 | On May 3, 2016, without Shurwest's knowledge, Schulze-Miller formed an Arizona

7 | company, MJSM Financial LLC ("MJSM"), so that she could become a FIP referrer.

8 | Schulze-Miller's intention in forming MJSM was to separate her Shurwest activities from

9 | her FIP-related activities so she could be a FIP referrer without involving Shurwest. MJSM

10 | referred advisors to FIP, and those advisors contracted directly with FIP. *Id.* at 4.

11 | Schulze-Miller went out of her way to hide her FIP-related activities and disclaim a

12 | relationship with FIP to Shurwest. **Shurwest did not have knowledge of MJSM's referral**

13 | **practice and did not receive any part of Schulze-Miller's FIP referral fees or**

14 | **commissions.** There is no Producer Marketing Agreement between Shurwest and FIP.

15 | Shurwest never referred any business to FIP. Shurwest never contracted with FIP,

16 | recommended FIP products, marketed FIP products or made any compensation off the sales

17 | of FIP products. *Id.* at 4-5.

18 | Schulze-Miller informed the advisors that she referred to FIP and others that her

19 | work related to FIP was separate from Shurwest. To any extent Schulze-Miller used her

20 | Shurwest email account to conduct the business of MJSM it was inadvertent. To any extent

21 | Schulze-Miller directed Shurwest employees other than Seabolt and Johnson to perform

22 | clerical tasks for MJSM, the employees did not know that the tasks were for the sole benefit

23 | of MJSM. *Id.* at 5.

24 | In April 2018, FIP shut down and ceased making payments to income investors. In

25 | April 2018, Shurwest discovered that Schulze-Miller had been marketing, promoting, or

26 | selling FIP products. In May 2018, Shurwest terminated Schulze-Miller's employment. *Id.*

4

119532614.2

at 6. Shurwest then sued Schulze-Miller for her unauthorized conduct. Schulze-Miller was represented by her own counsel and entered into a settlement of the lawsuit brought by Shurwest. In conjunction with the settlement of Shurwest suit, Schulze-Miller provided a Declaration which is attached as Exhibit B. Her sworn statements about the lack of Shurwest participation or knowledge of her relationship with FIP has since been recanted by Schulze-Miller. Shurwest believes the attached Declaration in which Schulze-Miller made statements under penalty of perjury, while represented by counsel of her own choosing, and receiving consideration of the dismissal of the Shurwest suit, is her true recitation of the facts. Numerous claimants, including Minnesota Life, dispute Shurwest's version of events recited above and asserted claims against Shurwest.

The FIP scheme of selling structured income products resulted in an investigation by criminal and regulatory authorities, including the Federal Bureau of Investigation. The investigation resulted in the indictment of principals of FIP and Schulze-Miller. Schulze-Miller has pled guilty to criminal charges and was awaiting sentencing as of this writing.

FIP's scheme was found to be an illegal and fraudulent Ponzi scheme by the United States District Court for the District of South Carolina. *In re Scott A. Kohn Future Income Payments, LLC,* District of South Carolina, Case No. 19-cv-01112-BHH.

The South Carolina District Court stayed any action involving FIP and other FIP entities. The U.S. District Court appointed a receiver over all entities with responsibility for investor losses resulting from the FIP scheme, including FIP, Schulze-Miller and MJSM. Shurwest is not a party to the FIP Receivership, and the District Court did not appoint a receiver as to Shurwest.

Despite never being implicated in the criminal and regulatory investigations or in the subsequent criminal cases, Shurwest and other non-debtor parties have been involved in extensive and costly litigation regarding FIP's structured cash flow products. The claims made against Shurwest include negligence, breach of fiduciary duty, aiding and abetting a

5

119532614.2

breach of fiduciary duty, negligent misrepresentation, negligent supervision, respondeat superior, unjust enrichment, California elder abuse, breach of contract, indemnification, violations of the Federal Securities Act of 1933 and Florida's Securities and Investor Protection Act. Due to lawsuits related to the events described, Shurwest's expense for professional fees alone in the first two quarters of 2021 was $1,756,791.00.

An Order was issued by U.S. District Court Judge Susan Bolton on Shurwest's Motion for Partial Summary Judgment in *Landmark American Insurance Company v. Shurwest, LLC, et al Arizona District Court Case No. 2:19-cv-04743-SRB at Docket No. 69.* The *Bolton Decision* discusses the facts underlying Schulze-Miller's acts and in relevant part concludes that Schulze-Miller acted without authorization from Shurwest in partnering with FIP: Shurwest did not have knowledge of MJSM's referral practice and did not receive any part of Schulze-Miller's FIP referral fees or commissions; and Schulze-Miller represented her work with FIP as separate from her work with Shurwest.

Numerous claimants, including Minnesota Life, dispute the Debtor's version of events described above and that the Bolton Decision has any relevance to their claims.

### *Generalized Alter-Ego and Successor Liability Claims Against Quantum*

In the various litigations pending throughout the country, some claimants have alleged alter-ego and successor liability claims against The Quantum Group, USA, LLC ("Quantum") or Element. At the same time, other similarly situated claimants have not brought alter-ego or successor liability claims against those parties.

The basis for the alleged alter ego and successor liability claims is laid out in the Ad Hoc Committee's Omnibus Statement of Facts (Docket No. 89). The summary of those allegations are:

- Shurwest and Quantum do a similar business;
- Shurwest and Quantum share the same address;
- Quantum and Shurwest share a phone number;

6

119532614.2

- Shurwest filed for the trademark "Quantum Group" and transferred it Quantum;
- Quantum and Shurwest are controlled by the same people or similar entities;
- Certain communications stated Shurwest is "rebranding";
- Some contractual rights or authority may have been transferred;
- Some agents that worked with Shurwest thought they were the same;
- Employees of Quantum or Element are similar to people who were employed by Shurwest; and
- Quantum offered website servicing that used to be offered by Shurwest to certain agents.

Shurwest's contractual relationships with Quantum and Element were arranged in good faith. The separate corporate existence of the two entities must be respected. The reasons for these agreements is laid out in greater detail in the Debtor's Responsive Statement of Facts at (Docket No. 120). The summary of those allegations are:

- Element was created as an employment services company;
- Certain lawsuits jeopardized the Shurwest business;
- Shurwest could no longer afford its full-time staff after certain lawsuits were filed;
- Shurwest could not work with certain life insurance or annuity companies due to the lawsuits;
- Shurwest could not raise capital;
- The creation of Element allowed employees to stay employed and not miss a paycheck;
- Quantum has a larger potential customer base than Shurwest ever did;

7

119532614.2

1  • The Services Agreement between Debtor and Quantum allowed the Debtor to

2  make lease payments, recover for technology infrastructure and share other

3  expenses that the Debtor would not otherwise be able to afford;

4  • Shurwest and Quantum maintain separate bank accounts;

5  • Quantum has not received any account receivables or payments owed to

6  Shurwest; and

7  • Quantum and Shurwest maintain separate corporate records.

8  If the alter ego and successor liability claims against Quantum and Element are not

9  resolved with the approval of the Court, either through an amendment to this Plan or a

10  settlement pursuant to Bankruptcy Rule of Procedure 9019, they will belong to the Sub-V

11  Trustee or other fiduciary exclusively to evaluate and, if viable pursue as generalized claims

12  of transfers that create successor liability or alter-ego or other remedies as well as resolve

13  any claims Quantum or Element have against the Estate.

14  The Debtor has worked to resolve procedural issues with over 100+ tort claimants.

15  Additionally, the Debtor has also reached an agreement with its largest single claimant

16  Minnesota Life. A Motion to Approve Settlement Pursuant to FRBP 9019 was filed with the

17  Court on July 13, 2022 ("9019 Motion"). The Court approved the 9019 Motion on

18  September 7, 2022 (DE 506), and the Court's order is final and non-appealable.

19  This Plan is designed to avoid the dissipation of Debtor's remaining and incoming

20  assets on attorney's fees and costs of multistate litigation in dozens of lawsuits, and so as to

21  guarantee a return on allowed claims against the Debtor's estate.

22  **III.  PLAN OVERVIEW**

23  The costs of litigating disputed unliquidated tort claims in various venues throughout

24  the country led to Shurwest's filing of a Chapter 11 bankruptcy petition. With the filing, the

25  Bankruptcy Code automatically stayed the 30+ lawsuits in nine states against Shurwest

26  arising from the FIP/Schultze-Miller fraud. On September 1, 2021, the Office of the United

8

119532614.2

States Trustee appointed Dawn Maguire, a Phoenix, Arizona attorney as the *Subchapter V Trustee*. She is charged with assisting in the negotiation of a Chapter 11 Plan, and other statutory responsibilities, and certain tasks post-confirmation under this Plan.

Through its Plan, the Debtor will pay its projected net operating income for a period of not less than three years to a reorganization fund (the "Reorganization Fund") for distribution to its creditors holding allowed claims. The Reorganized Debtor will pay any cash on hand after administrative creditors to the Reorganization Fund on the Effective Date, in not less than the following amounts:

- $719,200 to the Reorganization Fund on the first anniversary of the Effective Date,
- $885,200 to the Reorganization Fund on the second anniversary of the Effective Date and
- $1,071,000.00 on the third anniversary of the Effective Date. Shurwest will continue to operate its business for the duration of the Plan term.

Shurwest will retain all amounts of net operating income earned above these amounts.

The Debtor also proposes to assign claims against Quantum and Element (or any other related parties) held by the Estate to the Litigation Trustee for the benefit of the unsecured creditors. The claims to be assigned are either based on transfers allegedly made by Shurwest to Quantum and/or Element or conduct that may expose Quantum and/or Element to successor or alter-ego liability, which impacts all Shurwest creditors. The Litigation Trustee is Dawn Maguire and her employment as the Litigation Trustee will begin post-confirmation.

The Debtor will be responsible for resolving the claims of creditors through traditional claims allowance as permitted by the Bankruptcy Code and Bankruptcy Rules.

9

119532614.2

The Debtor's only secured creditor, RLS Capital Holdings, LLLP, will be paid in full with interest on the ~~first anniversary of the~~ Effective Date~~, by Reorganized Debtor, and not the Reorganization Fund~~. Any priority creditors will be paid in full ~~by Reorganized Debtor~~the Reorganization Fund on the Effective Date or with statutory interest over three years (an initial distribution within 30 days of the Effective Date and an annual pro rata payment on succeeding anniversaries of the Effective Date for 3 total payments). Unsecured creditors will be paid a pro-rated portion of their allowed claim through the Reorganization Fund. A list of creditors is attached as **Exhibit H.** The Reorganization Fund will be the required~~ment~~ minimum payments based upon estimated revenue from the Debtor's Net Operations post-petition, the Debtor will have the ability to finance the remaining projected net operating income prior to each anniversary of the Effective Date *plus* the recovery of any claims against third parties that belong to the Estate.

**IV.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

The U.S. Bankruptcy Code provides that a reorganization plan shall divide interested parties into classes of similarly situated claimants. For purposes of voting and distribution, the Plan classifies creditors, equity security holders and interested parties as follows:

**Class 1 – Administrative Claims**

Administrative Claims are those that have been incurred since the initiation of these bankruptcy cases or expenses entitled to administrative priority pursuant to §§507(a)(2) or 503(b) of the Bankruptcy Code. Administrative Claims are funded through the assets of the Debtor. Class 1 Claims are estimated to include the following:

Estate Professionals.  Estate Professionals include all professionals whose employment was approved by the Bankruptcy Court, including but not limited to Mesch, Clark & Rothschild, P.C. (fees previously approved at DE 451 and 473), Wyche, PA (fees previously approved at DE 336), Dawn Maguire - the *Sub-V Trustee* (fees previously

10

119532614.2

1 approved at DE282 and DE 461), King & Spalding (fees previously approved at DE 489),

2 LLP, Law Offices of Michael W. Carmel, Ltd., Dentons Bingham Greenebaum, LLP and

3 Miller, Pitt Feldman & McAnally, P.C (fees previously approved at DE 451).

4      As of November 10, 2022, Mesch Clark Rothschild is owed approximately $200,000,

5 the Sub-V Trustee is owed approximately $30,000, King and Spalding is owed

6 approximately $6,000 and Dentons is owed approximated $9,000.

7      Any Claims for fees, costs, and expenses incurred by any Chapter 11 Professionals

8 after the Effective Date will be treated as part of the business operating fees and expenses of

9 the Reorganized Debtor and need not be submitted to the Bankruptcy Court for approval,

10 provided, however, that Dawn Maguire shall continue to submit fee applications for

11 approval by the Court both for her role as Subchapter V Trustee and as Litigation Trustee,

12 until such time as those roles are terminated pursuant to this Plan and the Bankruptcy Code.

13      All Estate Professionals shall file with the Bankruptcy Court and serve an application

14 seeking approval and payment of any unpaid fees and costs incurred prior to the Effective

15 Date pursuant to Bankruptcy Code §330 within 30 days after the Effective Date. Any such

16 application that is not timely filed and served will be forever barred from distributions from

17 the bankruptcy estate.

18      <u>Post-Petition Expenses</u>.  Post-Petition Expenses include the operating expenses of the

19 Debtor incurred in the ordinary course of business after the Petition Date.

20

21      *These operating expenses have been paid in the ordinary course of the Debtor's*

22 *business.  Any outstanding amounts will be paid in full on the later of the Effective Date, or*

23 *in the ordinary course of the Debtor's business.*  Creditors that are current on their post-

24 petition ordinary course payments do not need to file an Administrative Expense claim.  To

25 the extent that any creditor believes it has an administrative expense claim that is not being

26 paid in the ordinary course, that creditor must file with the Bankruptcy Court and serve its

11

119532614.2

1  request for payment of administrative costs and expenses incurred after the Petition Date

2  and prior to the Effective Date, pursuant to Bankruptcy Code §§ 507(a)(1) and 503(b), no

3  later than thirty (30) days after the Effective Date.  Any such application that is not timely

4  filed and served will be forever barred from distributions from the bankruptcy estate.

5      **Class 1 Administrative Expenses are not impaired and not entitled to vote.**

6

7      **Class 2 – Secured Claim of RLS Capital**

8          This class consists of the secured claim of RLS Capital. Prior to filing bankruptcy,

9  RLS Capital loaned Shurwest the principal sum of $200,000.00 with interest accruing at

10 $1,666.67 per month. This loan is secured by a first priority lien on all of the assets (tangible

11 and intangible) owned by Shurwest. This claim is over-secured and will be entitled to

12 payment of interest and costs, including reasonable attorney's fees incurred, if any, after the

13 filing date pursuant to §506(b).

14      *The outstanding claim and any post-confirmation interest accruing at the WSJ prime*

15 *rate, will be paid by the* ~~Reorganized Debtor~~*Reorganization Fund  within twelve (12)*

16 *months after Effective Date.  RLS Capital will retain its prepetition lien, unless otherwise*

17 *agreed by the parties.*

18      **Class 2 claim is impaired and ~~not~~ entitled to vote.**

19

20      **Class 3 – Priority Tax Claims**

21          This class consists of any unsecured priority tax claims of the State of Arizona, the

22 Internal Revenue Service, and any municipality authorized to assess and collect taxes.

23 Shurwest is not aware of any priority tax creditors.

24      *The Class 3 Claims will be allowed in the principal amount of the tax due as of the*

25 *Petition Date. On the Effective Date, the Debtor will pay these claims in full to the extent*

26 *any such claims exist and have not already been paid. Any claims not paid in full on the*

12

119532614.2

1 *Effective Date will accrue interest at the applicable statutory rate, and be paid in full with*
2 *interest upon the availability of funds from Shurwest's business operations.* No such claims
3 were scheduled by the Debtor or timely filed before the claims bar date in this case.

4 **Class 3 claims are unimpaired and not entitled to vote.**

5

6 **Class 4 – Priority Wage and Benefit Claims**

7 This class consists of the unsecured priority claims for wages, including back pay
8 earned within 180 days before the filing date, but only to the extent of $13,650 for each
9 individual, as provided by the Bankruptcy Code. This class also includes any unsecured
10 priority claims for paid time off earned by certain employees. The Debtor does not believe
11 that any such claims exist.

12 *Class 4 Creditors owed wages or benefits earned within 180 days before the filing to*
13 *the extent of $13,650 for each individual will be paid by the ~~Reorganized~~*
14 *~~Debtor~~Reorganization Fund in full on the latter of Effective Date, or allowance of the claim,*
15 *to the extent any such claims exist.* No such claims were scheduled by the Debtor or timely
16 filed before the claims bar date in this case.

17 **Class 4 claims are unimpaired and not entitled to vote.**

18

19 **Class 5—Unsecured Creditors with Rejection Damage Claims**

20 This class consists of any creditor holding an unsecured claim arising out of the
21 rejection by the Estate of an unexpired lease or an executory contract. The Debtor does not
22 believe that there will be any creditors in this class. The Debtor has not rejected any
23 contracts during the pendency of this case, and does not intend to reject any contracts
24 through this Plan or otherwise.

25 *Allowed rejection claims holders will participate in the Reorganization Fund and*
26 *will receive a pro rata share in the amount that the allowed amount of its claim bears to the*

13

119532614.2

1    *size of the Reorganization Fund as of the Effective Date divided by the total of all Allowed*

2    *Class 5 and Class 6 claims.* *Allowed claims will receive an initial distribution within 30*

3    *days of the Effective Date from the Reorganization Fund and an annual pro rata payment*

4    *on succeeding anniversaries of the Effective Date for up to 4 total payments.* *Allowed Class 5*

5    *claims will receive an initial distribution within 30 days of the Effective Date and an annual*

6    *pro rata payment on succeeding anniversaries of the Effective Date for 3 total payments.*

7                         **Class 5 creditors are impaired and entitled to vote.**

8

9        **Class 6 – Unsecured Claims**

10         This class consists of the allowed, outstanding unsecured claims as of the Effective

11    Date ~~that do not have claims against Minnesota Life~~. The Bankruptcy Schedules reflect

12    claims against Shurwest in this class of $6,011,219.88. This class includes claims filed in

13    the approximate amount of $160,000,000.

14         Creditors with Class 6 claims will be subject to the regular claims resolution process

15    as provided by the Bankruptcy Code and Bankruptcy Rules if a claim objection is filed.

16         *Allowed Class 6 claims holders will participate in the Reorganization Fund and will*

17    *receive a pro rata share in the amount that the allowed amount of its claim bears to the size*

18    *of the Reorganization Fund as of the Effective Date divided by the total of all Allowed*

19    *Class 5 and Class 6 claims. Shurwest listed several unsecured creditors in its schedules that*

20    *are not disputed. To the extent such creditors did not file claims, or filed claims in amounts*

21    *equal to or less than those scheduled by Shurwest, they will be deemed Allowed on the*

22    *Effective Date, in the lesser amount of the filed or scheduled claims, without the need for the*

23    *Debtor to file any claim objections or take any other action to reconcile those claims[3].*

24

25    [3] Notwithstanding this provision, because Quantum may be a target of an avoidance action, it is not entitled to have its claims at #134 and #135 deemed allowed pursuant to 11 U.S.C. §

26    502(d), even though no objection against Quantum's claims have been filed. To the extent any alleged transfers to Quantum are avoided or resolved prior to any given distribution,

119532614.2

*Allowed claims will receive an initial distribution from the Reorganization Fund within 30 days of the Effective Date and an annual pro rata payment on succeeding anniversaries of the Effective Date for up to 4 total payments. Pro rata distributions will be calculated reserving a proportionate amount for disputed claims as discussed below.*

**Class 6 claims are impaired and entitled to vote.**

**Class 7 – Intentionally omitted.**

**Class 8 – Equity Interests**

This class consists of Shurwest's equity security holders. The equity holders of Shurwest are KT Equity Partners III, LLC, Shurwest Holding Company, Inc. and RLS Capital Holdings, LLLP.

*Current Equity will remain as Equity, they will not receive any distributions until after the Plan is fully consummated.*

**Class 8 interests are not impaired and not entitled to vote.**

V.    **IMPLEMENTATION OF PLAN**

A.    **Funding the Plan**

The Plan will be funded, in part, from Debtor's ongoing business operations. The post-petition gross income has been approximately $65,000 – 150,000 per month. The Debtor anticipates the post-confirmation operating expenses to be $35,000 – $40,000 per month. The net operating income will be contributed into a pool to be used for the repayment of allowed creditor claims, the "Reorganization Fund." For an understanding of the Debtor's Income Projections, please see **Exhibit C** attached, which provides projections

---

Quantum may assert such avoided amount as an allowed claim pursuant to 11 U.S.C. § 502(h).

1  for Shurwest net operating income to be funded into the Reorganization Fund over the next

2  three years. For an understanding of the Debtor's projected distributions, please see **Exhibit**

3  **E**.

4      The Estate will assign to the Litigation Trustee for the benefit of all creditors any of

5  its claims, if any, against Quantum or Element derivative of Shurwest's alleged liability or

6  any other claims the Litigation Trustee identifies prior to the Effective Date. This applies to

7  any tort based claimants with generalized claims including those that arise from Uniform

8  Fraudulent Transfer Actions or other actions ~~of~~ that may result in successor or alter-ego

9  liability against Quantum or Element or their successors.

10     As discussed above, the Debtor will continue to operate the Shurwest business, under

11 the review of the Sub V Trustee until substantial consummation. The Sub V Trustee will

12 also be the fiduciary who makes distributions under the Plan if the Plan is not consensual.

13 The Debtor's income derives from the sale of annuities and life insurance policies. The

14 Debtor believes that the income is likely to continue as projected in **Exhibit C**, the Debtor's

15 Income Projections.

16     **B.**    **Claims Allowance/Liquidation of Claims' Amounts**

17     i.    Claim Objections

18     The Debtor will be responsible for pursuing objections to claims asserted against the

19 Estate. The Debtor will have authority to settle any claim disputes, and agree on the

20 appropriate amounts of such claims. Court approval will be sought for resolution of claim

21 disputes.

22     The Debtor is also authorized to file appropriate pleadings implementing this Plan in

23 other jurisdictions as appropriate. The Sub V Trustee, ~~the Litigation Trustee and her~~

24 ~~professionals,~~ and the Reorganized Debtor ~~and Claims Administrator~~ shall be paid from the

25

26

16

119532614.2

1 Reorganization Fund after Fee Applications and subsequent order for any work related to
2 pre-confirmation claims.

3     ii.    Alter Ego, Successor Liability and Fraudulent Conveyance Claims

4     If not resolved before the Effective Date, fraudulent conveyance claims and
5 generalized alter-ego/successor liability against Quantum and Element (or related parties),
6 and their successors, if any, liability shall be deemed transferred to the Litigation Trustee, in
7 trust, by the order confirming the Plan to exclusively pursue and resolve for the benefit of
8 the Estate and the Allowed Class 5 and Class 6 creditors. The Litigation Trustee and her
9 professionals shall be paid from the Litigation Trust after Fee Applications and subsequent
10 order. Net recoveries after paying for any professional fees incurred through the litigation
11 of these claims will be added to the Reorganization Fund for distribution in accordance with
12 this Plan.

13     iii.    Deadlines

14     The Litigation Trustee shall initiate any avoidance actions or other lawsuits, and the
15 Debtor shall file any claims objections on or before March 31, 2023. The Litigation Trustee
16 shall be given a budget of $25,000.00 to investigate these claims that shall be reserved from
17 any initial distribution from the Reorganization Fund. Any actions not timely filed by the
18 Litigation Trustee shall be automatically deemed abandoned to the Debtor without further
19 notice or motion, and the Debtor or other interested party shall have an additional 90 days to
20 take appropriate action in the Bankruptcy Court until August 31, 2023. If no action is taken
21 such claims shall be extinguishedbarred.

22     iv.    Claims Retained by the Debtor

23     The Debtor is retaining, and not transferring to the Litigation Trustee, its scheduled
24 claims against Tami Hill and MJSM, LLC.  However, Debtor will not proceed with any
25 additional actions to recover on these claims because the Debtor reasonably believes, in the
26 exercise of its business judgment, that these claims are uncollectible.

119532614.2

**C. Payment/Distributions and Claims Reserve**

Payments and distributions to each holder of a Disputed Claim that becomes an Allowed Claim will be made in accordance with the provisions of the class in this Plan to which such Allowed Claim belongs. The Sub-V Trustee will be the Disbursing Agent under the Plan. The first payment from the Reorganization Fund will happen within thirty days of the Effective Date. The Disbursing Agent shall withhold from the funds to be distributed under this Plan and reserve for the amount attributable to any Claim that is a Disputed Claim. If a claim that is disputed is later allowed, on the next disbursement date under this Plan, the Disbursing Agent shall disburse to that claimant its pro-rata distribution in the amount that is equal to (i) what the claimant would have received had a disbursement been made to that claimant on any prior distribution, plus (ii) the amount to which the claimant is entitled under the latest distribution.

**D. Delivery of Distributions**

Distributions will be made at the addresses set forth in the Proofs of Claim filed by holders of Claims, the addresses reflected on the Schedules or the addresses set forth in written notices of address change delivered to the Debtor, or to the Disbursing Agent after the Effective Date.

If any distribution to a holder of an Allowed Claim is returned as undeliverable, no further distributions to such holder will be made unless and until the Disbursing Agent is notified of such holder's then-current address, at which time all missed distributions will be made to the holder without interest. All claims for undeliverable or uncashed distributions must be made on or before the first (1st) anniversary of the date applicable to such distribution, or with respect to the final distribution to a creditor holding an Allowed Claim, within ninety (90) days thereof. After such date, all such unclaimed property will revert to the Disbursing Agent for further distribution in accordance with the Plan, and the Claim of

18

119532614.2

any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat law to the contrary.

### E. Management of the Debtor Post-Petition

The Debtor will continue to be managed by the managers of Shurwest, LLC. The managers of Shurwest, LLC will not receive compensation for the management of the Debtor. Jim Maschek will continue as President of Shurwest, in effort to maximize net operating income he will not be paid by the Estate. Mr. Maschek is providing this service because he has an equity interest and is benefited by the completion of the Plan.

### F. Conditions Precedent to Effective Date

The following are conditions to the Effective Date, which conditions must be satisfied or waived by the Debtor:

1) The Confirmation Order has been entered by the Bankruptcy Court.

2) The Confirmation Order is in form and substance satisfactory to the Debtor.

3) ~~The funds~~All the Debtor's cash on hand less a $50,000.00 operating reserve paid to the Reorganization Fund in an amount not less than $100,000.00 of which $25,000 shall be reserved for the Litigation Trustee's investigation as described in Section V.B.3 above.

## VI. LIQUIDATION ANALYSIS

Pursuant to 11 U.S.C. §1129(a)(7), the Plan must provide that creditors not accepting the Plan will receive at least as much as they would in a liquidation of the Debtor under Chapter 7 of the Bankruptcy Code. Distributions to creditors under the Plan will exceed the recoveries they would receive in a Chapter 7 liquidation.

The Debtor's Liquidation Analysis does not include the value of claims the Estate may have against third parties, because those claims are preserved under this Plan for the

19

119532614.2

benefit of creditors, and the recovery is presumed to be the same under either a Chapter 7 or this Plan. The Liquidation Analysis also does not include the Administrative Expenses that could be allowed the against the Estate, as the costs would be similar.

The following analysis summarizes the value of Shurwest's assets and the treatment of Shurwest's creditors in a Chapter 7 liquidation as compared to their treatment under the Plan:

| Assets | Creditor | Liquidation Value | Amount Available for Unsecured Creditors |
|--------|----------|-------------------|------------------------------------------|
| Cash Collateral | RLS Capital | $506,778.39 | $306,778.39 |
| Cash that is not Collateral | N/A | $0.00 | $0.00 |
| Accounts Receivable | RLS Capital | $193,861.13 | $193,861.00 |
| Office Equipment Business Machinery, Equipment | RLS Capital | Estimated $10,000.00 liquidation value, not the book value listed on the schedules | $10,000.00 |
| Other Personal Property (intangibles, good will, security deposit) | RLS Capital | The intangibles listed on the schedules include goodwill; Debtor estimates that all intangibles have $0.00 as liquidation value. The Debtor has a security deposit of $45,000.00. | $45,000.00 |

119532614.2

| | | | |
|---|---|---|---|
| Claims | RLS Capital | The Debtor believes that any fraudulent transfer action or other claim against Quantum has no value, because no assets were transferred other than a trademark of no liquidation value, and the Debtor does not believe that any alter ego type claim would be successfully asserted. The Debtor believes that its claims against MJSM, LLC and Tami Hill also have no value because they are uncollectible. | $0.00 As a practical matter, Debtor believes that whatever value is ascribed to these claims, they have equal value under a liquidation or Plan scenario. |

The Debtor's Projections anticipate a return to unsecured creditors including administrative creditors of $2,676,200 through the confirmation of the Plan and including net operating income post-petition, but not including the liquidation of any claims against third parties for the benefit of the Estate. This is ~~more than~~over $2,~~3~~000,000 more than under the liquidation analysis, which would provide unsecured creditors including administrative creditors less than $200,000.00, not including the liquidation of any claims against third parties for the benefit of the Estate. Under a reorganization scenario, the Debtor will also retain the income from commission son renewals of previously sold policies that will be received and collected as insureds pay their premiums over the life of the Plan, but such commissions only become due to the Estate at the time such premiums are paid. The amount of the renewal revenue is unknown.

119532614.2

Based on the foregoing analysis, the Debtor believes that the Plan will provide a greater return to creditors than they would receive in a liquidation under Chapter 7. Accordingly, Shurwest satisfies the "best interests of creditors" test for confirmation of the Plan.

## VII.  RISK ANALYSIS

The projections are the Debtor's best and most realistic projections of future performance. Based upon these projections, the payments contemplated by the Plan will be made. Inherent in this Chapter 11 Plan are standard business risks. Despite these risks, Shurwest's Plan is workable and economically sound. The Plan will pay creditors more than they would receive if Shurwest's Plan were not confirmed, and this bankruptcy estate was liquidated instead.

## VIII.  CONFIRMATION IN SPITE OF REJECTION OF PLAN

The Court will be asked to confirm the Plan as to any class of claims or interest that does not accept the Plan. To do so, the Court must find that the Plan complies with standards established by the Bankruptcy Code, Section 1129(b).

## IX.  EFFECT OF CONFIRMATION

### *Discharge*

On the Effective Date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in §1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt: (i) imposed by this Plan; or (ii) to the extent provided in §1141(d)(6).

The Subchapter V Trustee shall act as Disbursing Agent and is entitled to compensation from the Debtor's projected disposable income. Any disputes regarding compensation of the Subchapter V Trustee will be subject to the Bankruptcy Court's

22

119532614.2

jurisdiction. Confirmation of this Plan does not discharge any debt provided for in this Plan until the Court grants a discharge on completion of all payments due within the first three years of this Plan, or as otherwise provided in §1192 of the Code. The Debtor will not be discharged from any debt: (i) on which the last payment is due after the first three years of the Plan, or as otherwise provided in §1192.

*Vesting*

Except as otherwise expressly provided in the Plan or in the Confirmation Order ~~and~~ after funding the Reorganization Fund, and after the deemed transfers of claims and causes of action to the Liquidation Trust, any remaining estate assets will be vested with Shurwest as of the Effective Date, free and clear of all claims, liens, encumbrances, charges, and other interests of creditors, and Debtor will thereafter hold, use, dispose or otherwise deal with such property and operate its business free of any restrictions imposed by the Bankruptcy Code or by the Court. In the event of a post-confirmation conversion to Chapter 7, all assets will be vested in a Chapter 7 Trustee at the time of the conversion.

**X.     RETENTION OF JURISDICTION**

The Bankruptcy Court will retain jurisdiction of this case to:

A.     determine the allowance of claims or interests, costs, attorney's fees, and payment of post-petition interest, or objections thereto;

B.     adjudicate any pending or filed adversary suits, and for any other purpose regarding the Plan;

C.     determine the allowance and payment of any administrative expenses;

D.     determine any dispute arising from the interpretation, implementation, or consummation of the Plan;

E.     make any modification of the Plan in the best interest of the Estate;

F.     address the rejection or assumption of any executory contracts that are subsequently discovered;

23

119532614.2

G.    enter orders confirming this Plan and closing these cases; and

H.    remove the Claims Administrator or Sub-V Trustee or Disbursing
      Agent and determine the appointment of a replacement.

## XI.    TAX CONSEQUENCES

The Debtor has not obtained a tax opinion and does not express any opinion as to the tax consequences to the creditors or equity security holders. Interested parties are encouraged to obtain their own professional counsel to determine the tax consequences of the Plan. Because the Debtor expresses no tax advice, in no event will the Debtor or its professional advisors be liable for any tax consequences of the Plan. Creditors must look solely to and rely solely upon their own advisors as to the tax consequences of this Plan.

## XII.    MODIFICATION OF PLAN

The Plan may be corrected or modified, prior to or subsequent to confirmation, or prior to consummation, after notice to interested parties and by order of this Court as provided by law consistent with 11 U.S.C. §1193.

## XIII.    MISCELLANEOUS

### A.    Definitions, Rules of Interpretation, Severability

For the purposes of this Plan, terms (which appear herein as capitalized terms) shall have the meanings as defined herein or as set forth in the attached Exhibit A, "Definition of Terms." Such meanings are equally applicable to the singular and the plural forms of the defined terms unless the context otherwise requires. Unless otherwise provided in this Plan, all terms used herein have the meaning assigned to them under the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure. The rules of construction applicable to the Bankruptcy Code and the Bankruptcy Rules are applicable to this Plan.

24

119532614.2

**B.      Enforceability**

Should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Plan.

**C.      Successors, Assigns and Applicable Law**

The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Arizona govern this Plan and any agreements, documents and instruments executed in connection with this Plan, except as otherwise provided in this Plan.

**D.      Exculpation and Limitation of Liability**

Pursuant to 11 U.S.C. §1107, the Debtor's fiduciaries are provided statutory qualified immunity for those instances they step into the shoes of a Chapter 11 trustee during the administration of this Case. This same qualified immunity is thereby imputed to the Debtor's bankruptcy Professionals authorized by the Bankruptcy Court to provide services on behalf of this Bankruptcy Estate. This qualified immunity is limited in nature. It only pertains to actions taken by the Debtor's fiduciaries and its authorized Professionals from the Petition Date, through the Confirmation Date, upon which date a Chapter 11 trustee's duties and responsibilities to the Bankruptcy Estate are terminated by statute. The qualified immunity is only applicable to those actions taken by the Debtor's fiduciaries and its authorized bankruptcy Professionals for actions that are necessary to the administration of the Bankruptcy Case. Qualified immunity shall not extend to ordinary business transactions of the Debtor. This qualified immunity is equal to the same protection afforded a bankruptcy trustee and such trustee's professionals. *In re Cochise College Park, Inc.*, 703 F.2d 1339,

119532614.2

1359 (9th Cir. 1983); *In re Castillo*, 248 B.R. 153, 157 (9th Cir. BAP 2000); and *In re Kashani*, 190 B.R. 875, 883 (9th Cir. BAP 1995). Finally in recognition of the applicability of the Barton Doctrine, any party seeking to bring an action against a fiduciary of the Debtor, or its authorized professionals, for actions arising from or related to this bankruptcy proceeding, must seek permission of the bankruptcy court before commencing a lawsuit in another forum. *See In re Crown Vantage, Inc.,* 421 F.3d 963, 970 (9th Cir. 2005); see also *In re Kashani*, 190 B.R. at 885.

**E.      Notices**

Except as otherwise set forth below, all notices, requests, elections or demands in connection with this Plan, including any change of address regarding any Claim, for the purposes of receiving any distributions under this Plan, shall be in writing and shall be delivered personally or mailed by stamped first class mail to the address below. Such notice shall be deemed to have been given the next business day after receipt or, if mailed by first class mail, seven (7) days after the date of mailing.

**Formatted:** Line spacing: Exactly 24 pt

26

119532614.2

To:     Shurwest, LLC
        Attention James Maschek, President
        17550 N. Perimeter Dr., Suite 300
        Scottsdale, Arizona 85255

With copies to:
        Mesch Clark Rothschild, PC
        Attention Michael McGrath and Isaac Rothschild
        259 N. Meyer Ave.
        Tucson, Arizona 85701
        mmcgrath@mcrazlaw.com
        jrothschild@mcrazlaw.com

        Dawn M. Maguire
        Trustee Maguire
        5415 E. High Street, Suite 200
        Phoenix, AZ 85054
        TrusteeMaguire@gamlaw.com

**XIV.  RECOMMENDATION OF THE DEBTOR**

The Debtor believes that the Plan represents the most practical and effective means for repaying the claims of creditors. The Debtor recommends that the Plan be approved as it is in the best interest of this Estate and its creditors.

27

119532614.2

Field Code Changed

Field Code Changed

**XV. EXHIBITS**

    **A.**      **Definitions of Terms**

    **B.**      **Declaration of Melanie Schulze-Miller**

    **C.**      **Income Projections**

    **D.**      **Liquidation Analysis**

    **E.**      **Projected Distributions**

    **F.**      **List of Claims Against Third Parties**

    **G.**     **G.**     **Litigation Trust Agreement**

    **F.H.**     **H.**     **List of Claims Against the Bankruptcy Estate**

DATED: ~~November 22~~December 12, 2022     SHURWEST, LLC

 

                    By:    /s/James Mascheck
                            James Maschek
                            Its President

MESCH CLARK ROTHSCHILD

By:    /s/Isaac D. Rothschild, #25726
        Michael McGrath
        Isaac D. Rothschild
        Attorneys for Debtor

Notice of Electronic Filing ("NEF")
electronically served on the date of
filing upon the registered CM/ECF
Users herein as evidenced by the NEF.

~~4891-2288-7234, v. 1~~4886-4476-1663, v. 2

119532614.2

Formatted: Heading 2

Formatted: Font: Bold, Raised by 2 pt

Formatted: No bullets or numbering